**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Von Dale MASSEY, Sr., Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Sandra WILKINS, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jack Z. WILKINS, Defendant–Appellant.**

Nos. 93–6026 to 93–6028.

United States Court of Appeals, Tenth Circuit.

March 6, 1995.

June E. Tyhurst, Asst. Federal Public Defender, Oklahoma City, OK, for defendant-appellant Von Dale Massey.

Edward Crandall, Oklahoma City, OK, for defendant-appellant Sandra Wilkins, submitted on the briefs.

Jill M. Wichlens, Asst. Federal Public Defender, Denver, CO (Michael G. Katz with her, on the brief), for defendant-appellant, Jack Z. Wilkins.

H. Lee Schmidt, Asst. U.S. Atty., Oklahoma City, OK (Vicki Miles–LaGrange, U.S. Atty., John E. Green, U.S. Atty., and Susan Stewart Dickerson, Asst. U.S. Atty., were on the briefs), for plaintiff-appellee.

Before TACHA and EBEL, Circuit Judges, and SAM, District Judge.*

EBEL, Circuit Judge.

Three codefendants appeal from their convictions and sentences arising out of an extensive fraud scheme. On appeal, they complain that: 1) there was insufficient evidence to support the convictions; 2) the court's sentences violated the Ex Post Facto Clause of the United States Constitution; 3) the court erred in not granting their motions for a mistrial; 4) the court double-counted certain conduct during sentencing; 5) there was an illegal disparity between the sentences of coconspirators; 6) the court improperly admitted evidence of the prior bad acts of one

* Honorable David Sam, District Judge for the United States District Court for the District of Utah, sitting by designation.

defendants' coworkers; 7) the court improperly increased one defendant's offense level for his role in the offense; and 8) the court erred in enhancing one defendant's sentence for obstruction of justice. We remand for further findings on the obstruction of justice enhancement, but affirm on all other issues.

## BACKGROUND

Defendants–Appellants Von Dale Massey ("Massey"), Jack Z. Wilkins, and Sandra Wilkins were indicted and convicted on ten counts, including one count of conspiracy to defraud, in violation of 18 U.S.C. § 371 (count one); eight counts of mail fraud, in violation of 18 U.S.C. § 1341 (counts two through nine); and one count of money laundering, in violation of 18 U.S.C. § 1957(a) (count ten). Jack and Sandra Wilkins are married. Also indicted was Roy Thornton ("Thornton"), who pled guilty during the trial. Edward Price ("Price"), also involved in the scheme, pled guilty to conspiracy but was not part of the indictment with the others.

In 1987, Price, an officer of J.R. Edwards Mortgage Investment Corp. ("JRE"), an Oklahoma City loan broker, contacted Massey and hired him at JRE due to Massey's knowledge about creative loan programs. One of these programs was the "European Loan Program," which ended up constituting the alleged fraud at the heart of this case. As part of this program, clients paid an advance fee to JRE to help secure a loan through certain Atlanta "lending" institutions and then another fee of $35,000 to the Atlanta "lender." The fee to JRE consisted of an application fee ($595 to $895) and a committal fee ($9,000 to $10,000) for JRE to obtain the loan. The borrowers sought loans between $500,000 and $150,000,000, and were told that the Atlanta loans were to be funded by various European sources. The loans were to be "self-liquidating," in that the borrower would only pay the interest on the debt for ten years and then have the principal liquidated. Part of the $35,000 fee paid to the Atlanta lenders was supposed to be used to purchase collateral that would generate enough income over the ten-year life of the loan to "liquidate" the principal. This fee did not vary based on the amount of the loan sought by

the borrower and promised by the Defendants and JRE never performed credit checks on any clients. JRE solicited clients through nationwide newspaper advertisements in publications including the *Wall Street Journal* and the *Chicago Tribune.*

JRE used the revenue from the fees paid to it to pay commissions to the loan originators, Massey's commissions, and operating expenses. Massey allegedly received a cut on almost every JRE "European Loan Program" application, totalling approximately a third of the total fees paid to JRE. Thirty-three clients applied for this program, but the indictment focused on three JRE clients: Happy Trails Charter, Pet Care, and Clarion Airport Inn.

Much of the $35,000 fee that these clients paid to the Atlanta lenders was supposed to have been paid into an escrow account to purchase collateral to liquidate the loans, but the fees were instead placed into the operating accounts of the Atlanta lenders or the personal accounts of Sandra and Jack Wilkins. Some of this money was spent by Sandra Wilkins on personal items such as remodeling her home.

On the Atlanta side of the scheme, Jack Wilkins was involved with all the "lending" institutions, which included Aslanien, Mortgage Trust Services, International Brokers Group, International Mortgage Exchange, and Global Investments. Global eventually held all the JRE accounts. Sandra Wilkins did not formally become employed by Global until after all the clients had sent their money, although some of the money was placed in her personal account before she started the work at Global. Codefendant Thornton worked as a loan originator for Aslanien and International Mortgage Exchange, but did not work with the other organizations in Atlanta.

When the clients did not receive their loans on the expected date, Global and JRE sent them letters explaining why the funding of the loans had not occurred. Sandra Wilkins signed many of the letters and personally vouched for the program. The prosecution alleged that these letters were part of the fraud, because they lulled the clients into

thinking that the loans were forthcoming. Many excuses were used for the delays in the loans, such as excessive· rainfall in Spain. Sandra Wilkins also sent clients inspirational poetry on the subject of not quitting. Eight of these letters formed the basis for mail fraud counts two through nine.

During February 1989, Price, Massey, and Jack Wilkins met in Atlanta to discuss the program. Allegedly, Price wanted more money from Wilkins in order to continue obtaining clients. Wilkins eventually sent $17,000 by wire to Price at JRE, and characterized it as a loan. The money came from the fees that four JRE clients had paid the Atlanta operations. The government claimed that this transaction involved the illegal proceeds of the mail fraud and thus gave rise to the money laundering count. 18 U.S.C. § 1957(a).

All three Defendants were convicted of all ten counts. After sentencing, Massey and the Wilkinses filed their appeals.

## DISCUSSION

### I. Sufficiency of the Evidence

■ Jack Wilkins, joined by Sandra Wilkins and Massey, argues that the government failed to proffer sufficient evidence to establish money laundering under 18 U.S.C. § 1957(a).[1] In essence, they claim that the money wired to Oklahoma City, that formed the basis of the money laundering count, was not derived from acts· of mail fraud—the predicate offense upon which the government relied. They argue that any acts of mail fraud relating to the money occurred after the wire to Oklahoma rather than before.

Section 1957(a) provides:

Whoever ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is

derived from specified unlawful activity, shall be punished. ...

The essential elements of a § 1957 violation are that "(1) the defendant engage or attempt to engage (2) in a monetary transaction (3) in criminally derived property (4) knowing that the property is derived from unlawful activity, and (5) the property is, in fact, derived from 'specified unlawful activity.'" *United States v. Lovett,* 964 F.2d 1029, 1041 (10th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 169, 121 L.Ed.2d 117 (1992).[2] "Criminally derived property" is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). The crimes constituting "specified unlawful activity" are laid out in § 1956(c)(7). 18 U.S.C. § 1957(f)(3).

Included among these specified crimes is mail fraud, a violation of 18 U.S.C. § 1341. 18 U.S.C. § 1956(c)(7)(A); 18 U.S.C. § 1961(1)(B). The mail fraud statute provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing to be delivered by the Postal Service, or takes or receives therefrom, any matter or thing ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341. The statute thus requires the government to show that (1) in furtherance of (2) a scheme or artifice to defraud, (3) the defendant placed an item in (or received an item from) the care of the Postal Service.

. We have recently stated that the text and legislative history of § 1957(a) suggest that

---

1. Both Sandra Wilkins and Massey submitted motions after oral argument to adopt Jack Wilkins' arguments regarding the sufficiency of the evidence to support their money laundering convictions. We grant their motions and treat Jack Wilkins' arguments as having been made by all three defendants.

2. Massey argues that there was insufficient evidence of a monetary transaction over $10,000 because he only received a cash loan· of $7,000 from Price out of the $17,000 transfer. However, this was not the transaction at issue in the indictment or the trial.· Only the $17,000 wire transfer from Jack Wilkins to Price at JRE was at ·issue.

"Congress targeted only those transactions occurring after proceeds have been obtained from the underlying activity.... Section 1957 appears to be drafted to proscribe certain transactions in proceeds that have already been obtained by an individual from an underlying criminal offense." *United States v. Johnson*, 971 F.2d 562, 569–70 (10th Cir. 1992); *Lovett*, 964 F.2d at 1042. *See also United States v. Edgmon*, 952 F.2d 1206, 1213 (10th Cir.1991) (noting that the Senate report on a similar money laundering statute, 18 U.S.C. § 1956, "makes plain" that the statute was designed to criminalize "the post-crime hiding of illgotten gains"), *cert. denied*, — U.S. —, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992).

The Defendants present evidence that the $17,000 wire transfer at issue came from an account that was opened with money obtained from five European Loan Program clients: Chris and Karen Kastner, Steven Ennis, Dale VanWyk, and Kermit Dehaii. No other money was placed in this account from March 13, 1992—when the account was opened with $102,000 of the above clients' fees—to March 24, 1992, when the wire to Oklahoma occurred. The indictment specifies eight instances of mail fraud as the predicate specified criminal activities for the alleged money laundering. However, none of the lulling letters alleged as mail fraud in the indictment or presented into evidence was sent to the five clients named above prior to the March 24 transaction. Two lulling letters, forming counts two and three of the indictment, were sent to another client, Happy Trails, prior to the March 24 transaction.

The Defendants rely upon this evidence to argue that the $17,000 sent by wire was not the proceeds of mail fraud because none of the five clients from whom the money was obtained was sent any mail prior to the monetary transaction. Accordingly, they assert, there was insufficient evidence to sustain the verdict because the government did not show that the wired funds were derived from specified criminal activity.

■ The Defendants' argument is predicated upon a crucial assumption: that the "scheme or artifice to defraud" is limited to each individual defrauded client. 18 U.S.C.

§ 1341. This would mean that many "schemes" made up the European Loan Program, one for each defrauded client. The Defendants do not articulate the reasoning behind this assumption and provide no authority for the proposition that a "scheme to defraud" under section 1341 is limited to an individual victim.

To the contrary, "scheme to defraud" has a wider meaning than an individual act of fraud. A scheme refers to the overall design to defraud one or many by means of a common plan or technique. *See e.g., United States v. Sampson*, 371 U.S. 75, 76–79, 81, 83 S.Ct. 173, 173–75, 176, 9 L.Ed.2d 136 (1962) (finding defendants mailed lulling letters in furtherance of a "nationwide, fraudulent scheme" to fraudulently obtain fees from businesspeople); *United States v. Reddeck*, 22 F.3d 1504, 1507–08 (10th Cir.1994) (finding defendant was involved in a scheme to defraud large numbers of potential students into believing facts about his university that were not true); *United States v. Levine*, 983 F.2d 165, 166–67 (10th Cir.1992) (describing scheme of defendant to defraud municipalities in many states through fraudulent invoices). Here, the scheme to defraud was the elaborate European Loan Program run through JRE and the Atlanta lenders. Multiple "clients" fell victim to the fraudulent plan practiced by the defendants under the aegis of one "business."

■ The jury had evidence from which they could reasonably conclude that the two lulling letters, admittedly to clients other than those whose money was wired, furthered the overall scheme as well as the fraud against that individual victim. Lulling letters can further a fraudulent scheme for the purposes of the mail fraud statute. *Sampson*, 371 U.S. at 81, 83 S.Ct. at 176 ("We cannot hold that such a deliberate and planned use of [lulling letters in] the United States mails by defendants engaged in a nationwide, fraudulent scheme in pursuance of a previously formulated plan could not, if established by evidence, be found by a jury ... to be 'for the purpose of executing' a scheme within the meaning of the mail fraud statute.") (quoting 18 U.S.C. § 1341); *United States v. Kelley*, 929 F.2d 582, 585 (10th Cir.)

("[M]ailings which facilitate concealment of a fraudulent scheme meet the 'furtherance' requirement [of section 1341].'"), *cert. denied,* 502 U.S. 926, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991). The letters sent prior to the March 24 transfer could be found to further the scheme to defraud because they helped avoid detection and exposure of the fraudulent nature of the European Loan Program. Accordingly, the letters protected the plan ·to defraud all of the victims and not just the victim to whom the letter was sent.

■ Finally, the jury could reasonably find that the fees deposited in the bank account from which the wire transfer was sent were derived from the fraudulent scheme that was furthered by the lulling letters. The "proceeds" of mail fraud are derived from the success of a fraudulent scheme that has been facilitated through the use of the mails. *See United States v. Hollis,* 971 F.2d 1441, 1451 n. 4 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993). Further, the jury instructions and indictment referred to one large scheme—the JRE European Loan Program—and not to a number of small schemes to bilk individual clients. Accordingly, we conclude that the jury had sufficient evidence to conclude that the government met all of

the elements of money laundering under § 1957.[3]

## II. *Ex Post Facto Application of Sentencing Guidelines*

·. ■ Jack Wilkins challenges the district court's use of the 1992 version of the Sentencing Guidelines as violative of the ban against *ex post facto* laws.[4] U.S. Const., art. I, § 9, cl. 3. "A sentencing court is generally required to apply the Guidelines that are in effect on the date the defendant is sentenced." *United States v. Gerber,* 24 F.3d 93, 95 (10th Cir.1994). However, the Ex Post Facto Clause bars· the sentencing court . from retroactively applying a sentencing guideline when it prejudices the defendant by inflicting greater punishment for an offense than the law allowed when the offense was committed. *Id.* at 95–96. In doing so, the Ex Post Facto Clause performs two important functions: "to restrain legislatures and courts from arbitrary and vindictive action and to prevent prosecution and punishment without fair warning." *Devine v. New Mexico Dep't of Corrections,* 866 F.2d 339, 344 (10th Cir.1989). We apply a two prong test to determine whether the retroactive application of a guideline violates the Ex Post Facto Clause: 1) did the sentencing court apply the guideline to "events occur-

---

3. Both Massey and Sandra Wilkins also make general and broad claims that there was insufficient evidence to support any of their convictions. Notwithstanding their protests, we conclude that sufficient evidence existed to establish that both were members of a conspiracy to defraud JRE's clients. The evidence shows that Massey was involved with the scheme from the inception, introduced the loan plan, and was involved with its operation in Oklahoma City. Sandra Wilkins' personal account reflected JRE client fee deposits even before she formally began work at Global. She used these fees for personal purposes. Further, once at Global, she authored some of the lulling letters.

The jury could quite reasonably infer the fraudulent nature of the scheme and the Defendant's knowledge thereof from the nature of the European Loan Program itself. No credit checks were made on any of the "borrower" clients. Further, the application fee that was supposed to secure collateral to liquidate the principal on the loans after ten years did not vary despite the fact that the amounts of the sought loans varied between $500,000 and $150 million. The Defendants do not challenge the fact that they were

involved in the promotion and operation of the European Loan Program. Thus, sufficient evidence to support the conspiracy charges existed in the record.

Further, the jury could reasonably conclude that the acts of mail fraud and money laundering were both in furtherance of the conspiracy and reasonably foreseeable. Thus, Massey and Sandra Wilkins can be held liable for the substantive offenses.

Therefore, we conclude that there is no merit to Sandra Wilkins' and Massey's sufficiency of the evidence claims.

In a similar vein, we find no merit in Sandra Wilkins' claim that the district court erred by attributing to her, for sentencing purposes, the full amounts defrauded from the victims, because the losses were not foreseeable. U.S.S.G. § 1B1.3. We believe that the evidence, taken with all reasonable inferences in favor ·of the government, shows that she was part of the conspiracy and that the fraud against the JRE clients was foreseeable, indeed the main aim of the conspiracy.

4. Sentencing for Massey and the Wilkinses took place on January 12, 1993.

ring before its enactment"; and 2) did the guideline "disadvantage the offender affected by it." *Gerber,* 24 F.3d at 96 (quoting *Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987)).

■ Jack Wilkins did not raise the *ex post facto* issue at sentencing, so we must apply the plain error standard of review. *Id.* at 95; Fed.R.Crim.P. 52(b). "To constitute plain error, the error must have been both 'obvious and substantial.... An error is substantial if it seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Gerber,* 24 F.3d at 95 (quoting *United States v. Brown,* 996 F.2d 1049, 1053 (10th Cir. 1993)) (internal quotations omitted). However, because the *ex post facto* issue is constitutional, we will apply the plain error rule less rigidly. *Id.*

■ Wilkins was convicted of eight counts of mail fraud that occurred prior to November 1, 1989. The district court found that the losses attributable to the mail fraud scheme amounted to $1,346,000. When these criminal acts were committed, U.S.S.G. § 2F1.1(b)(1)(J) enhanced the base offense level for fraud by nine points when the fraud resulted in $1,000,001 to $2,000,000 in losses. U.S.S.G. Appendix C, ¶ 154 at 126 (1994). However, this provision was amended effective November 1, 1989, to provide that district courts must add eleven points for losses between $800,001 and $1,500,000. *Id.* at 127.

Because Wilkins was convicted of multiple related counts, the district court used the grouping provisions of Part D of Chapter Three of the Sentencing Guidelines to group all of the counts together under U.S.S.G. § 3D1.2(d). Section 3D1.2(d) permits grouping when:

> the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

The section further provides that fraud and money laundering offenses are the type of offenses that fall under this provision. U.S.S.G. §§ 3D1.2(d), 2F1.1, & 2S1.2. Jack Wilkins does not challenge the grouping of the sentences and we therefore do not address the appropriateness of the grouping.

Pursuant to the grouping scheme, the district court aggregated the losses from the mail fraud scheme to arrive at an offense level of 23.[5] U.S.S.G. §§ 3D1.3(b) & 2F1.1. Moreover, the offense level from the money laundering scheme was also 23.[6] U.S.S.G. § 2S1.2. Under U.S.S.G. § 3D1.3(b), the court was obligated to use the guideline that produces the highest offense level for the group. Since the offense levels were identical for the mail fraud and the money laundering, the court's choice was immaterial.

■ We thus conclude that there was no plain error in this case. Even if we assumed that the district court improperly calculated the offense level for some of the mail fraud counts because of an *ex post facto* problem, the district court would have still used the offense level of 23 from the money laundering for the group sentence—with which there is no *ex post facto* problem.[7] Hence, under

---

5. The base offense level was six. The district court added: eleven levels because of the $1,346,000 loss, U.S.S.G. § 2F1.1(b)(1)(L); two levels because the offense involved more than minimal planning, U.S.S.G. § 2F1.1(b)(2); and four points for Jack Wilkins' role in the offense, U.S.S.G. § 3B1.1(a).

6. The base offense level was 17. U.S.S.G. § 2S1.2. Two levels were added because the offense involved proceeds from an unlawful activity, U.S.S.G. § 2S1.2(b)(1)(B), and four levels were added for Jack Wilkins' role in the offense. U.S.S.G. § 3B1.1(a).

7. We note that the base offense level of 23 can also be justified on the alternative ground that the conspiracy to commit mail fraud count, which grouped with the substantive mail fraud counts, would also have resulted in the offense level of 23. Since conspiracy is a continuing offense, a conspirator may be sentenced under a law that is passed during the course of the conspiracy and that increases the penalty—as was the situation in the instant case. *United States v. Stanberry,* 963 F.2d 1323, 1327 (10th Cir.1992) ("When a conspiracy begins during a period where the application of certain Guidelines would be controlling and extends into a period when another Guideline application would be appropriate, there is no violation of the *ex post facto* clause in applying the Guidelines in effect at the time of the last act of the conspiracy.").

the appropriate application of the guidelines, Wilkins merited the base offense level of 23 calculated by the district court.

## III. Failure to Call a Mistrial

Jack Wilkins complains that the district court erred when it denied his motion for a mistrial. He alleges that the testimony of his coconspirator Thornton so prejudiced his trial as to make it unfair. Thornton was charged with the Wilkinses and Massey in the indictment and initially entered a plea of innocence. All four were tried together. On the third day of the trial, however, Thornton announced his intention to plead guilty to the conspiracy count in exchange for the dismissal of the other counts. Counsel for Massey and the Wilkinses moved for a mistrial on the ground that Thornton's absence would create prejudicial inferences of guilt. The court denied the motion, but gave a cautionary instruction to the jury, informing it to draw no inferences from the absence of Thornton.

On the sixth day of the trial, the government called Thornton as a witness against Massey and the Wilkinses. Thornton testified about his and the Defendants' involvement in the European Loan Program. He also testified that he had been charged in this case but had changed his plea to guilty on the conspiracy count. The district court instructed the jury at that point:

> [T]he guilty plea by Mr. Thornton may not be regarded by you as evidence from which you may draw an inference of guilt as to any of the remaining Defendants. You'll recall I instructed you at the outset that the case must be separately established by evidence against each person on trial here.

R.O.A. at 745. The jury was similarly instructed in the written instructions.

Jack Wilkins claims that he was prejudiced because the jury saw that Thornton had originally claimed innocence and then changed his plea to guilty during the course of the trial. He believes that this injured him by raising the suggestion that his claim of innocence is also false and that the cautionary instructions were insufficient to cure this prejudice.

"The decision to deny a motion for a mistrial is within the discretion of the trial court judge and we will reverse only if there is a showing that the trial court abused that discretion." *United States v. Novak,* 918 F.2d 107, 108 (10th Cir.1990). We have regularly approved the introduction of evidence of a coconspirator's guilty plea to assess the coconspirator's credibility and show an acknowledgment by the witness of participation in the offense. *United States v. Davis,* 965 F.2d 804, 815 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993); *United States v. Davis,* 766 F.2d 1452, 1456 (10th Cir.), *cert. denied,* 474 U.S. 908, 106 S.Ct. 239, 88 L.Ed.2d 240 (1985). The district court must instruct the jury, however, that a guilty plea by a coconspirator may not be used as substantive evidence of a defendant's guilt. *Davis,* 965 F.2d at 815–16. In addition, we have held that a judge may inform a jury that a co-defendant has pled guilty during the midst of a trial, so long as the jury is instructed not to use the plea as evidence of his or her codefendants' guilt. *United States v. Baez,* 703 F.2d 453, 455 (10th Cir.1983); *United States v. Earley,* 482 F.2d 53, 58–59 (10th Cir.), *cert. denied,* 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973). *See also United States v. Bavers,* 787 F.2d 1022, 1028–29 (6th Cir.1985) (no need to call a mistrial when codefendant changed plea and testified against other codefendant).

Wilkins provides little in the way of evidence or authority to suggest why the district court abused its discretion. He solely argues that the turnaround by Thornton caused the jury to think that he was lying about his innocence as well. However, the jury was twice instructed that it could not infer anything about Wilkins' guilt from the fact of Thornton's guilty plea. Further, the jury was carefully instructed of Wilkins' presumption of innocence and the need for the government to prove his guilt through evidence beyond a reasonable doubt. Cautionary instructions are ordinarily sufficient to cure alleged prejudice. *United States v. Sanders,* 929 F.2d 1466, 1470 (10th Cir.), *cert. denied,* 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991). In addition, the fact that Thornton switched his plea cuts two

ways. Admittedly, it may have caused the jury to wonder if Jack Wilkins' plea of innocence was untruthful. However, the switch also may have reduced the credibility of Thornton as a government witness. Finally, Wilkins fails to provide any authority or convincing argument why his situation is any different from previous cases in which we have allowed the judge to inform the jury of a midtrial switch of a codefendant's plea or allowed coconspirators testifying against a defendant to acknowledge their guilty pleas. Lacking any evidence of prejudice, we find that the district court did not abuse its discretion in denying Wilkins' motion for a mistrial.

## IV. Double–Counting of Conduct During Sentencing

Jack Wilkins claims that the district court impermissibly double-counted his conduct by adjusting his offense level upward by two points under U.S.S.G. § 2F1.1(b)(2)(A) for more than minimal planning, and by four points under § 3B1.1(a) for being a leader or organizer of the criminal activity.[8] However, we have previously explained that the sentence adjustments under U.S.S.G. §§ 2F1.1(b)(2)(A) and 3B1.1(a) address different concerns. *United States v. Smith*, 13 F.3d 1421, 1429 (10th Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 209, 130 L.Ed.2d 138 (1994). The adjustment for more than minimal planning was intended to "distinguish between relatively simple crimes and more sophisticated ones." *Id.* (quoting *United States v. Wong*, 3 F.3d 667, 671 (3d Cir. 1993)). "On the other hand, the adjustment for the role in the offense, 'addresses concerns about the relative responsibilities of those involved in the commission of the offense, punishing those more harshly who assume a leadership role.'" *Id.* at 1429 (quoting *Wong*, 3 F.3d at 672).[9] Thus, the district court could enhance Jack Wilkins' sentence under both provisions, without impermissibly double-counting identical conduct. *Id.*

**8.** Jack Wilkins made this argument in a supplemental brief. We granted his motion to file this supplemental brief on March 8, 1994.

**9.** Jack Wilkins' argument relied upon dicta from the version of *United States v. Flinn*, 18 F.3d 826

## V. Disparity in Sentences

All three Defendants complain that the district court erred when it imposed stiffer sentences upon them than upon their co-defendant, Roy Thornton, who pled guilty early in the trial. The Defendants correctly point out that similar offenders engaged in similar conduct should ordinarily be sentenced equivalently. *United States v. Goddard*, 929 F.2d 546, 550 (10th Cir.1991). However, disparate sentences are allowed where the disparity is explicable by the facts on the record. *United States v. Garza*, 1 F.3d 1098, 1101 (10th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 617, 126 L.Ed.2d 581 (1993). We review the district court's decision to impose a disparate sentence under an abuse of discretion standard. *Goddard*, 929 F.2d at 550.

For his membership in the conspiracy, Thornton was sentenced under U.S.S.G. § 2X1.1(a), which provides that the offense level for the crime of conspiracy is taken from the base offense level and adjustments of the substantive offense, in this case found in U.S.S.G. § 2F1.1. The adjustment to the base offense level for fraud in § 2F1.1 is based upon the amounts of losses attributable to the defendant. In the case of jointly undertaken criminal activity, a defendant is accountable for the actions of conspirators when: 1) the actions are in furtherance of the jointly undertaken criminal activity; and 2) the criminal conduct was reasonably foreseeable. U.S.S.G. § 1B1.3, Application Note 2.

> Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. ... The conduct of others that was not in

(10th Cir.1994), that was available on Lexis and Westlaw prior to the release of the opinion for official publication. This dicta is not present in the published version of *Flinn*.

furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that activity, is not relevant conduct under this provision.

*Id.*

The conspiracy alleged in the indictment, and for which the jury convicted the Defendants, was to defraud the JRE clients through the European Loan Program. Thirty-three clients were identified as JRE fraud victims. Massey and the Wilkinses had a role in the defrauding of all 33 of these clients, and the district court sentenced them based on these clients' losses. On the other hand, Thornton was only involved with the conspiracy as an employee or principal of the Aslanien and International Mortgage Exchange lending operations in Atlanta. The district court held Thornton responsible for the losses of the eight JRE clients whose fees were paid to these operations, resulting in a lower offense level than Massey and the Wilkinses.

This allocation of responsibility is based on real, rational differences between the defendants, and we do not conclude that the district court abused its discretion.[10]

## VI. Prior Convictions of Massey's Coworkers

■ Massey complains that the district court abused its discretion by allowing the prosecutor to question him on the stand about his employment in 1983 at a different loan brokerage company. During his tenure at the other brokerage, clients were defrauded in a fashion similar to the scheme in the present case—the brokerage obtained fees from clients but never secured loans for them. Some of Massey's coworkers were convicted of fraud as a result of this scheme.

Massey was indicted for the fraud, but charges were later dropped.

At trial, the prosecutor cross-examined Massey regarding a resume of Massey's sent to clients that contained no references to the prior brokerage experience. The district court allowed the prosecution to inquire into the fact that Massey worked for the brokerage company, none of the customers received loan funds, and others in the prior brokerage were convicted of fraud. No mention was made of Massey's indictment. The government offered the evidence in order to show that Massey had knowledge about the type of loan scheme he was involved with at JRE and that it had potentially criminal consequences. The district court instructed the jury only to consider the evidence for those purposes.

■ Massey claims that this evidence was evidence of prior bad acts subject to Fed.R.Evid. 404(b), which renders inadmissible evidence of prior acts to prove the character of a person in order to show conformity therewith.[11] However, this evidence is admissible for a number of other purposes, such as to show motive, knowledge, intent, preparation, or absence of mistake. We review the district court's decision to admit Rule 404(b) evidence under an abuse of discretion standard. *United States v. Record,* 873 F.2d 1363, 1373 (10th Cir.1989).

Massey's sole challenge to the admission of the evidence is that the convictions had taken place five years before the charged conduct and were thus too remote in time. We have noted that the probative value of evidence of a prior illegal act depends upon the temporal proximity between the prior and charged acts. *United States v. Easter,* 981 F.2d 1549, 1554 (10th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 2448, 124 L.Ed.2d 665 (1993). Nonetheless, "[t]here is no absolute rule re-

---

**10.** Massey points to evidence that Thornton worked with 37 "self-liquidating loan" clients at Aslanien. Massey Brief at 5. However, Massey admits that most of these clients were referred from brokers other than JRE, and are hence outside the scope of the charged conspiracy. The Defendants do not show that they were sentenced for losses from JRE clients referred to Aslanien that were not also taken into account when sentencing Thornton.

**11.** We note that the evidence at issue in this case is about the prior bad acts of individuals other than Massey. It does not necessarily reflect on the character of Massey. Thus, this evidence may not really be Rule 404(b) evidence at all. Nonetheless, because the possibility of guilt by association raises some specter of prejudice, we will assume *arguendo* that the evidence is 404(b) evidence.

garding the number of years that can separate offenses. Rather, the court applies a reasonableness standard and examines the facts and circumstances of each case." *United States v. Cuch*, 842 F.2d 1173, 1178 (10th Cir.1988) (quoting *United States v. Franklin*, 704 F.2d 1183, 1189 (10th Cir.), *cert. denied*, 464 U.S. 845, 104 S.Ct. 146, 78 L.Ed.2d 137 (1983) (allowing evidence of crime committed four years prior to charged act)).

Massey has not demonstrated that the prior convictions of his coworkers for fraud were so stale that their admission constituted an abuse of discretion. Massey and his codefendants were charged with conspiracy to commit, and committing, a complex financial crime that was extensive both in time and preparation. The knowledge required to set up such a scheme was specialized. In this context, the five-year gap between the prior acts and the present scheme was not so large that we can conclude that the district court abused its discretion by allowing the evidence. Indeed, the evidence was quite probative of Massey's knowledge of the type of fraudulent scheme charged in this case.

### VII. Adjustment for Role in Offense

The district court increased Massey's sentence for being the organizer or leader of an extensive criminal activity under U.S.S.G. § 3B1.1(a). The court found that Massey was the effective leader or organizer of the JRE operation in Oklahoma City that obtained clients for the European Loan Program.

A district court may increase the offense level of a defendant by four points if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). We have found a number of factors significant in the determination of whether a defendant is an "organizer or leader," including whether the person: 1) recruited accomplices; 2) controlled distribution of profits; 3) took a larger share of the profits; and 4) exercised control and decision-making authority over coconspirators. *United States v. Litchfield*, 959 F.2d 1514, 1523 (10th Cir.1992). Applicability of a guideline is an issue of law that we review de

novo, while issues of fact are reviewed under the clearly erroneous standard. *Id.* at 1521.

██ There is sufficient evidence to support the district court's conclusion that Massey was the organizer or leader of the fraudulent JRE operation in Oklahoma City. Massey implemented JRE's European Loan Program and could thus be considered a recruiter insofar as he enlisted the JRE employees to participate in the scheme. Further, he made most of the decisions regarding the European Loan Program applications received from clients of JRE. He was the person in contact with the Wilkinses and Thornton in Atlanta. In addition, the evidence suggests that he may have received as much as one third of the fees paid to JRE by the European Loan Program clients. Finally, although Price was nominally in charge of JRE, his testimony suggests that Massey made all the substantive decisions regarding the European Loan Program. Accordingly, we do not consider the district court's characterization of Massey as an organizer or leader of the JRE European Loan Program to be erroneous.

██ Further, we agree with the district court's characterization of the criminal scheme as "otherwise extensive." The district court noted the long duration of the conspiracy and its national scope. JRE advertised in national papers such as the *Chicago Tribune* and the *Wall Street Journal*, and attracted clients from many parts of the country. The scheme had operations in both Atlanta and Oklahoma City. Further, the JRE operation involved many employees other than the coconspirators. Use of non-criminally responsible persons in the scheme is relevant to whether a crime is "extensive." U.S.S.G. § 3B1.1, Application Note 3 (1994) ("Thus, a fraud that involved only three [criminally-liable] participants but used the unknowing services of many outsiders could be considered extensive."). We thus agree with the district court that the European Loan Program was extensive, and affirm its decision to increase Massey's criminal offense level under U.S.S.G. § 3B1.1(a).

*VIII. Sandra Wilkins' Adjustment for Obstruction of Justice*

■ Pursuant to U.S.S.G. § 3C1.1, the district court concluded that Sandra Wilkins committed perjury and therefore increased her base offense level two points for obstruction of justice. "The district court's application of the Sentencing Guidelines to the facts of a particular case is entitled to due deference and its factual findings will not be reversed unless clearly erroneous." *U.S. v. Urbanek,* 930 F.2d 1512, 1514 (10th Cir.1991). In order to apply the § 3C1.1 enhancement, it is well-settled that a sentencing court must make a specific finding—that is, one which is independent of the jury verdict—that the defendant has perjured herself. *United States v. Dunnigan,* — U.S. —, —, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993); *United States v. Yost,* 24 F.3d 99, 106 (10th Cir.1994).

We have two problems with the district court's findings on the perjury enhancement under § 3C1.1. First, the court failed to make even generalized findings as to each of the elements of perjury as required by the Supreme Court in *United States v. Dunnigan,* — U.S. —, —, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993). Second, the court has failed to identify or describe the statement that it concluded was perjurious as required by well-established Tenth Circuit law. Accordingly, we would have no way of reviewing the district court's findings on the elements of perjury even if it had made such findings. Thus, we must remand for the required additional findings.

■ *Dunnigan* mandated that "the court make[ ] a finding of an obstruction of justice that encompasses all of the factual predicates of perjury." — U.S. at —, 113 S.Ct. at 1117. The elements of perjury are that a witness: (1) when testifying under oath, gives false testimony; (2) concerning a material matter; (3) with willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory. *Id.* at

—, 113 S.Ct. at 1116. Based on the rule outlined above, *Dunnigan* upheld a district court's finding that "the defendant was untruthful at trial with respect to material matters ... that were designed to substantially affect the outcome of the case" because it addressed all three elements of perjury. *Id.* at —, 113 S.Ct. at 1117.

In the instant case, the district court's findings on the issue of perjury consisted of the judge's statement that Sandra Wilkins' "testimony was false." R.O.A. at 1191. The district court did not specify which portion of her testimony was false nor whether the false testimony was material or willful. The court did note that "[t]he testimony wasn't reconcilable with the jury verdict" and that "the jury had to find that the testimony was false in order to convict Ms. Wilkins." *Id.* However, these observations merely corroborate the district court's finding of falsity. Missing from the district court's findings are the necessary findings on materiality and willfulness.

In addition, although *Dunnigan* did not require sentencing judges specifically to identify the perjurious statement, it has long been a requirement in the Tenth Circuit that the perjurious statement be identified, at least in substance.[12] The Tenth Circuit first suggested the requirement that a sentencing judge must point specifically to the portion of the defendant's testimony that was perjurious in order to enhance a defendant's sentence under § 3C1.1 in *United States v. Hansen,* 964 F.2d 1017, 1020 (10th Cir.1992). Following *Dunnigan,* we have continued to require that sentencing judges specifically identify or describe the perjurious testimony before applying the enhancement under § 3C1.1. *See United States v. Markum,* 4 F.3d 891, 897 (10th Cir.1993) (underscoring the requirement that "the trial court must specify which portion of the defendant's testimony it considers to be false"); *United States v. Arias–Santos,* 39 F.3d 1070, 1076 (10th Cir.1994) (same), *cert. denied,* — U.S.

---

12. The Tenth Circuit rule is in addition to the requirements of *Dunnigan,* and in no way inconsistent with *Dunnigan,* which recognized that it was "preferable" for a district court specifically to identify the alleged perjurious statement. —

U.S. at —, 113 S.Ct. at 1117. The Tenth Circuit has merely adopted administratively this preferred approach as the procedure to be followed in this circuit.

——, 115 S.Ct. 1156, 130 L.Ed.2d 1113 (1995). The Sixth Circuit has adopted a similar approach. *See United States v. Ledezma,* 26 F.3d 636, 645 (6th Cir.) (remanding on the ground that "[u]nless, by its findings, a trial court identifies the testimony it finds perjurious either explicitly or be reference to its context, we are unable to discharge our appellate responsibility to determine whether the court's findings are clearly erroneous"), *cert. denied,* —— U.S. ——, 115 S.Ct. 349, 130 L.Ed.2d 305 (1994).[13]

In this case, the district court failed to give us any idea as to what specific testimony it concluded was perjurious. The totality of the district court's finding was as follows,

The testimony wasn't reconcilable with the jury verdict; that is, necessarily the jury had to find that the testimony was false in order to convict Mrs. Wilkins. I accept that finding. It's my personal finding in the case that the testimony was false, and consequently the objection is overruled. I want the record to be clear that the two-level adjustment is not made merely because she testified.

R.O.A. at 1191. Because we do not know what testimony the district court believed to be perjurious, we are left wholly unable to satisfy our appellate responsibility of review in determining whether the record would support findings of falsity, materiality, and willful intent, even if the district court had made such findings as required by *Dunnigan.* It is for this reason that we have adopted a prudential requirement in *Hansen, Markum* and *Arias–Santos* that the district court must indicate or describe the nature of the testimony found to be perjurious. Once the perjurious testimony is identified, *Dunnigan* then permits fairly conclusory findings that such testimony was false, material, and given with intent to commit perjury and we are able to meaningfully review those findings against the record.

We do not mean to imply that the district court must recite the perjurious testimony verbatim. The district court may generally identify the testimony at issue from his or her trial notes or memory and it is sufficient if such testimony is merely described in substance so that when we review the transcript we can evaluate the *Dunnigan* findings of the elements of perjury against an identified line of questions and answers without having simply to speculate on what the district court might have believed was the perjurious testimony.

Because the district court both failed to make findings as to the elements of perjury as required by *Dunnigan* and because it failed to describe the testimony that it concluded was perjurious as required by *Hansen, Markum,* and *Arias–Santos,* we must remand for the district court to make further findings. *See Yost,* 24 F.3d at 106–107 (remanding issue where district court had not made the requisite findings on all the factual predicates of perjury); *United States v. Rubio–Topete,* 999 F.2d 1334, 1341 (9th Cir. 1993) (remanding for further findings when district court found that behavior and testimony of defendant warranted enhancement because the court failed to address specifically each of the elements of perjury); *United States v. Tracy,* 989 F.2d 1279, 1289–90 (1st Cir.) (remanding case for further findings to determine whether the false testimony was intentionally false and as to a material mat-

13. Other circuits have displayed different approaches in reviewing § 3C1.1 enhancements. *See, e.g., United States v. Turk,* 21 F.3d 309, 313 (8th Cir.1994) (viewing judge's statement that defendant committed perjury "by denying any involvement in the drug conspiracy" as a "specific finding[] of [a] particular false statement"); *United States v. Colletti,* 984 F.2d 1339, 1348 (3rd. Cir.1992) (in order to impose enhancement, the elements of perjury "must not only be clearly established, ... but also must be sufficiently far-reaching as to impose some incremental burdens on the government, either in investigation or in proof, which would not have been necessary but for the perjury"); *United States v. Barbosa,* 906 F.2d 1366, 1370 (9th Cir.) (rejecting suggestion that "a district court make specific findings as to those portions of a defendant's testimony it believes to have been falsified"), *cert. denied,* 498 U.S. 961, 111 S.Ct. 394, 112 L.Ed.2d 403 (1990). Due to the variety of approaches taken by the circuits, commentators have highlighted the need for clarification in the language of the provision and for assistance in its application. *See, e.g.,* Kevin J. Kelley, Note, *To Enhance Or Not To Enhance: A Guide To Uniformity In Applying Perjury Enhancements Under Section 3C1.1 Of The United States Sentencing Commission Guidelines: United States v. Dunnigan,* 27 Creighton L.Rev. 585 (1994).

ter), *cert. denied,* —— U.S. ——, 113 S.Ct. 2393, 124 L.Ed.2d 294 (1993).[14]

## CONCLUSION

We REMAND for further findings regarding Sandra Wilkins' increase in offense level due to an alleged obstruction of justice. We AFFIRM on all other issues.

---

**14.** Sandra Wilkins also complains that the district court erred when it increased her criminal offense level on Counts Two through Nine by two points for a fraud involving more than minimal planning or a scheme to defraud more than one victim. U.S.S.G. § 2F1.1(b)(2). This argument is devoid of merit.

Her challenge to the district court's calculation of the money laundering offense level under U.S.S.G. § 2S1.2(b)(1)(B) is similarly without merit.