FILED
United States Court of Appeals
Tenth Circuit

July 18, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENCH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff–Appellee,

v.

RANDON TAMAR SALLIS, a/k/a
Triple X Gangsta,

        Defendant–Appellant.

No. 06-7111

Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. CR-06-00007-002-RAW)

Submitted on the briefs:[*]

Beverly A. Atteberry, Beverly A. Atteberry PC, Tulsa, Oklahoma, for the
Defendant–Appellant.

Gregory Dean Burris (Sheldon J. Sperling, United States Attorney, and Rob A.
Wallace, Assistant United States Attorney, with him on the briefs), Office of the
United States Attorney, Eastern District of Oklahoma, Muskogee, Oklahoma, for
the Plaintiff–Appellee.

Before **BRISCOE** and **LUCERO**, Circuit Judges, and **BRIMMER**,[**] District

---

[*] At the parties' request, the case is unanimously ordered submitted without
oral argument pursuant to Fed. R. App. P. 34(f) and 10th Cir. R. 34.1(G).

[**] The Honorable Clarence A. Brimmer, United States District Judge for the
District of Wyoming, sitting by designation.

Judge.

**LUCERO**, Circuit Judge.

Randon Tamar Sallis was convicted on eleven criminal counts and sentenced to 360 months' imprisonment.  He now appeals his sentence on two grounds, claiming that the district court improperly applied sentencing enhancements for being a leader or organizer of a criminal enterprise under U.S.S.G. § 3B1.1, and for possession of a firearm under § 2D1.1.  Because we conclude that the district court properly applied these sentencing enhancements, we affirm the sentence.

## I

On February 15, 2006, Randon Tamar Sallis ("Randon"), along with coconspirators Brandon Lamar Sallis ("Brandon") and Demarcus Johnson, was charged by superseding indictment on fifteen counts of various drug and firearm

violations.[1]  According to the government, Randon and Brandon, his identical

twin brother,[2] led a drug distribution ring based in Muskogee, Oklahoma.

At the Sallises' jury trial, the government offered testimony from a number

of witnesses and coconspirators, but we highlight only the evidence related to

issues presented in this appeal.  We summarize first the key testimony relevant to

the drug violations, and then the evidence regarding the firearm counts.

**A**

David Mitchell testified that he had known Randon and Brandon since they

were teenagers and that he purchased ecstasy, cocaine, methamphetamine, and

marijuana from them.  According to Mitchell, Randon would "front" drugs to

him, meaning that he repaid Randon after he had sold the drugs to others.  He

stated that the Sallis brothers often traveled to California to purchase drugs.  On

---

[1] The charges were: conspiracy to distribute methamphetamine, cocaine, and marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A); possession of methamphetamine with intent to distribute in violation of § 841(a)(1) and (b)(1)(A)(viii); two counts of possession of marijuana with intent to distribute in violation of § 841(a)(1) and (b)(1)(D); possession of cocaine with intent to distribute in violation of §§ 841(a)(1) and (b)(1)(C); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2; falsifying a government form in the acquisition of a firearm in violation of § 922(a)(6); receiving a firearm while charged by way of information in violation of § 922(n); possession of Xanax with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D)(2) and 18 U.S.C. § 2; and three counts of possession of ecstasy with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2. The indictment also included three counts of criminal forfeiture under 21 U.S.C. § 853.

[2] Brandon filed a separate appeal of his sentence in United States v. Sallis, No. 06-7112, 2008 WL ____ (10th Cir. June __, 2008) (unpublished).

one occasion, Mitchell observed Brandon and Randon with between $50,000 and $100,000 in cash stashed in the back seat of a car. Randon told Mitchell that they were driving to California to purchase drugs and later offered Mitchell $2500 to make such a trip to California, but he declined. The government also introduced airline records showing that Randon took seven one-way trips from Oklahoma to California. Brandon reserved but a single one-way ticket from Oklahoma to California; however, he did not take the flight.

Andre McJunkins, a distant cousin of Randon and Brandon, reported a conversation he had with Randon about one of the California trips. Randon told McJunkins that he and Brandon had been "busted" in California and lost about $80,000 between them. McJunkins also stated that he had seen coconspirator Johnson, whom he described as the Sallises' "flunky," with a pound of marijuana and an ounce of crack cocaine. According to McJunkins, Johnson "didn't have as much power as [Randon and Brandon] did."

Jerry Clemons, who is the Sallises' brother-in-law, also confirmed that the brothers frequently traveled to California to purchase drugs. Before leaving on these trips, the brothers would pool their money together, and upon returning would divide the drugs up into smaller portions for sale. According to Clemons, the drugs were jointly owned by Randon and Brandon. Clemons testified that the brothers fronted drugs to Mitchell, Johnson, and two other individuals. Johnson and Clemons cooked cocaine powder provided to them by Randon and Brandon

into crack cocaine, which they then resold. In addition, the brothers paid Clemons to act as their bodyguard and to guard their house.

Karah Lehman, Brandon's former girlfriend, also testified. At trial, she stated that on two occasions, she received cocaine from Randon, sold it, and returned the proceeds to Randon. Another witness, James Baccus, stated that Brandon and Mitchell had fronted methamphetamine to him repeatedly, but that Randon was not around when these transactions occurred. John Cone explained that he had engaged in several drug transactions with Randon between February and November 2004, selling a total of 15 to 20 kilograms of cocaine to him, but that he did not have any contact with Brandon.

**B**

With respect to the firearm counts, the government introduced the testimony of Officer Jeremy Johnson, who on March 20, 2005, stopped a black Chevrolet truck driven by Randon. Randon told Johnson that he had a recently purchased a firearm located in the trunk. On investigation, Johnson discovered that it was a Glock handgun with a serial number of GSW 783. Randon was allowed to continue on his way.

Officer Lincoln Anderson, who served as an undercover narcotics officer for the Muskogee Police Department, also testified at trial. Anderson stated that he had purchased drugs from McJunkins on several occasions. At one point, Anderson told McJunkins he wanted to sell a black nine-millimeter pistol in

exchange for drugs, and McJunkins put him in touch with Brandon. Following a telephone conversation with Brandon, Anderson and McJunkins drove over to Mitchell's house on March 31, 2005. A black Chevrolet truck was parked outside the house, which, according to Anderson, was normally driven by Randon.[3] McJunkins took the nine-millimeter pistol given to him by Anderson into the house and, after a few minutes, returned with a bag of methamphetamine. Mitchell stated that he, Brandon, and Randon were all in Mitchell's room during the gun transaction, and that all of them handled the gun, but that Brandon took actual possession of the firearm.

Shortly after McJunkins traded the gun for drugs, police executed a search warrant on Mitchell's house. Police took Mitchell, Randon, Brandon, and another man into custody and then proceeded with the search. Inside the house, officers found the black nine-millimeter pistol that McJunkins had traded for drugs, a variety of drugs, another nine-millimeter handgun, and ammunition. Pursuant to the terms of the warrant, police also searched the vehicles parked in the driveway of the house. While searching the black Chevrolet truck, they discovered ammunition and a Glock handgun with serial number GSW 783, the same gun Randon claimed as his in the earlier encounter with Officer Johnson.

---

[3] Clemons and Lehman also testified that Randon owned a black Chevrolet truck, and Mitchell stated that Randon and Brandon had arrived at his house that day in the same truck.

**C**

On submission of the case, the jury acquitted Randon on the charge of firearm possession in furtherance of a drug trafficking crime, but convicted him on all other counts. A presentence report ("PSR") was prepared, which recommended a base offense level of 36, see U.S.S.G. § 2D1.1(a)(1) & (c)(2), a two-level enhancement for possession of a dangerous weapon in connection with drug trafficking, see § 2D1.1(b)(1), and a four-level enhancement for being the leader or organizer of a criminal activity that involved five or more participants, see § 3B1.1(a). Considering a total offense level of 42 and a criminal history category of I, Randon's recommended United States Sentencing Guidelines ("Guidelines") sentencing range was 360 months to life in prison.[4]

Randon filed timely objections to the PSR, and reiterated these objections at his sentencing hearing. He claimed that he was not a leader or organizer for purposes of the leader enhancement and that the evidence does not support an enhancement for possession of a firearm.[5]

Concluding that the leader enhancement was appropriate, the district court found that Randon and Brandon "appeared to be equal partners in the drug

---

[4] Randon was also subject to a mandatory minimum sentence of ten years' imprisonment for his convictions on Counts 1 and 2 of the indictment, pursuant to 21 U.S.C. § 841(b)(1)(A).

[5] He also objected to the drug quantity used to calculate his sentence, but this objection is not at issue on appeal.

conspiracy." Specifically, the court noted that the two pooled their money, traveled together to obtain drugs for distribution, sold and fronted drugs to others, and collected proceeds from their coconspirators. It also relied on trial testimony showing that Mitchell, Lehman, and Baccus were fronted drugs, that Clemons "was a muscle man," and that Johnson was considered by others to be the Sallises' "flunky." Based on this evidence, the court found that Randon was a leader or organizer of a drug conspiracy involving more than five participants.

The court also determined that the firearm enhancement applied. This was concluded on the basis of witness statements that Randon was known to carry a firearm in relation to his drug dealing activity, and that a firearm and drugs were seized during Randon's arrest on March 31, 2005.[6] Adopting the PSR's recommendation, the court sentenced Randon at the bottom of the Guidelines range to a total of 360 months' imprisonment.

## II

On appeal, Randon challenges only two aspects of his sentence: the leader enhancement and the firearm possession enhancement. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Our appellate review of a defendant's sentence "includes both a procedural component, encompassing the method by which a sentence was calculated, as well as a substantive component,

---

[6] In addition, the court noted that Randon had illegally purchased a firearm and that his coconspirator Brandon had also possessed a firearm in furtherance of drug trafficking, which would have been reasonably foreseeable to Randon.

which relates to the length of the resulting sentence." United States v. Smart, 518 F.3d 800, 803 (10th Cir. 2008). Randon challenges only the procedural reasonableness of his sentence, which requires proper calculation of his Guidelines range. Gall v. United States, 128 S. Ct. 586, 597 (2007). We review a sentencing court's interpretation of the Guidelines de novo and its factual findings for clear error. United States v. Walters, 269 F.3d 1207, 1214 (10th Cir. 2001).[7]

**A**

Randon claims that the district court incorrectly enhanced his sentence based on his alleged role as a leader or organizer of criminal activity. Although he concedes that there is evidence that he bought, sold, and fronted drugs, he contends that this behavior is insufficient to qualify him as a leader or organizer. This claim is inconsistent, however, with the district court's finding that Randon exercised extensive control over the drug conspiracy.

---

[7] The government contends that we need not address whether the district court properly applied the sentencing enhancements because the district court provided an alternative basis for its decision, stating that it would impose the same sentence even if the Guidelines did not apply. In United States v. Pena-Hermosillo, 522 F.3d 1108, 1117-18 (10th Cir. Apr. 15, 2008), however, we held that a similarly conclusory alternative rationale was not procedurally reasonable because the court failed to provide the explanation of reasons required by 18 U.S.C. § 3553. In the present case, because the sentencing court's primary rationale for its holding was both adequately explained and procedurally reasonable, we do not address the alternative rationale.

The Guidelines provide for a four-level sentencing enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). As the application notes for this guideline explain, courts should consider factors including:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

§ 3B1.1 cmt. n.4.

This court has elaborated that "[i]n considering these factors, the sentencing court should remain conscious of the fact that the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures." United States v. Torres, 53 F.3d 1129, 1142 (10th Cir. 1995) (quotations and citations omitted). We have also identified several factors which might indicate that a defendant exercised the requisite control over others, including that: other sellers worked for him, were recruited by him, or had their activities controlled by him; "he paid others for their efforts on behalf of the conspiracy"; "he restricted the people to whom other

coconspirators could sell their drugs"; and "he controlled the manner of sales, set prices, or claimed the right to a larger share of proceeds." United States v. Anderson, 189 F.3d 1201, 1212 (10th Cir. 1999); see also United States v. Massey, 48 F.3d 1560, 1572 (10th Cir. 1995) (listing similar factors).

By contrast, a defendant's participation in illegal but lower-level activities will not support application of the enhancement. In Anderson, we stated that evidence that the defendant received profits and was involved in the production of drugs was insufficient to warrant the enhancement. 189 F.3d at 1212. In addition, a "role as a supplier of drugs to others, standing alone, is not enough" to justify the leader enhancement. Id. Similarly, supplying drugs on credit, or fronting, without more, is not a basis for the enhancement. United States v. Owens, 70 F.3d 1118, 1129 (10th Cir. 1995).

Relying on Anderson, Randon argues that he acted merely as a supplier of drugs, and that there is no evidence indicating that he satisfied any of the factors for applying a leadership enhancement. As Randon correctly notes, the burden is on the government to prove by a preponderance of the evidence that the leadership enhancement applies. United States v. Cruz-Camacho, 137 F.3d 1220, 1224 (10th Cir. 1998).

Randon's main objection relates to the characterization of his sales activities, particularly that he fronted drugs to others. Although Randon admits fronting drugs, he contends that he did not exercise any control over others'

actions after handing over the drugs, and he claims that he did not receive any additional profits by fronting drugs. He compares himself to a car dealer, sometimes selling drugs outright and other times loaning them out to be repaid later. See Owens, 70 F.3d at 1128-29 (agreeing with defendant's flour wholesaler/retailer analogy and stating that "Pillsbury could not be considered the 'organizer or leader' of a local bakery merely because it supplied flour on credit and derived significant profits from the business relationship"). According to Randon, he was not directing a drug sales force, but rather was simply receiving deferred profits. He also notes that there is no evidence indicating that he determined the manner of sales or set prices. See Anderson, 189 F.3d at 1212.

Even assuming Randon's characterization of these fronting transactions is correct, we conclude that his other conduct sufficiently establishes that the enhancement was properly applied. A defendant need not meet each of the Anderson factors in order to qualify for the enhancement. Rather, our inquiry focuses on the "gravamen" of this enhancement, which is the extent of Randon's "control, organization, and responsibility for the actions of other individuals." Torres, 53 F.3d at 1142.

In this case, the record indicates that Randon and Brandon exercised joint decision making authority, determining what quantity of drugs they would purchase, how they would do so, and who would distribute those drugs. See U.S.S.G. § 3B1.1 cmt. n.4 (listing "exercise of decision making authority" and

"the degree of participation in planning or organizing the offense" as relevant factors). As to the nature and degree of Randon's participation, see id., he personally went to California to obtain drugs and then packaged the drugs for resale. The district court found that both Randon and Brandon recruited others to assist in transporting and selling drugs and to provide protection. See Anderson, 189 F.3d at 1212. This finding is supported by Mitchell's testimony that Randon offered him money to travel to California on a drug purchasing trip, and Clemons' assertion that both brothers paid him to be a bodyguard. The "nature and scope" of the drug trafficking activity is also relevant, as Randon dealt in various kinds of drugs over a period of several years. See § 3B1.1, cmt. n.4.

Taken together, the evidence indicates that Randon was more than an ordinary drug dealer or participant in a drug dealing conspiracy. He was also more than "an important or essential" figure in the scheme. We conclude that Randon exercised the kind of leadership and control that the enhancement seeks to penalize. Because the district court's factual findings are not clearly erroneous, and Randon's conduct properly qualifies for an enhancement under § 3B1.1(a),[8] we affirm this aspect of Randon's sentence.

_____

[8] We note that the district court found by a preponderance of the evidence that "five or more participants" were involved in the conspiracy. Specifically, it discussed the roles that Randon, Brandon, Mitchell, Lehman, Baccus, Clemens, and Johnson played in the conspiracy. Randon does not challenge this finding on appeal.

**B**

Randon next challenges the sentencing enhancement under U.S.S.G. § 2D1.1(b)(1), which provides for a two-level enhancement "[i]f a dangerous weapon (including a firearm) was possessed" in the course of a drug trafficking offense. First, Randon points out that the jury acquitted him of possessing a firearm in relation to a drug trafficking crime. Second, he claims that he did not constructively possess the firearms at issue. We determine that both of these arguments are meritless.

As to the first argument, Randon's acquittal on the firearm charge does not bar the district court from considering that same conduct at sentencing. In two cases decided before United States v. Booker, 543 U.S. 220 (2005), we held that a district court could apply the § 2D1.1(b)(1) sentencing enhancement despite a defendant's acquittal of firearm possession under 18 U.S.C. § 924(c). See United States v. Eagen, 965 F.2d 887, 892 (10th Cir. 1992); United States v. Coleman, 947 F.2d 1424, 1429 (10th Cir. 1991). After Booker, we reaffirmed that "a sentencing court [has] broad discretion to consider information concerning the defendant's life and characteristics, including conduct on which he had not been convicted." United States v. Magallanez, 408 F.3d 672, 684 (10th Cir. 2005). Because "different standards of proof . . . govern at trial and sentencing . . . [a] jury verdict of acquittal on related conduct . . . does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that

- 14 -

conduct has been proved by a preponderance of the evidence." Id. (quotations omitted). Accordingly, the district court did not commit legal error in considering the evidence of firearm possession.

Randon next argues that the government failed to demonstrate by a preponderance of the evidence that he possessed the firearms found in Mitchell's house. Because he did not own or live in the house where the guns were found, he claims that this is a case of joint occupancy, and thus the government must show some "nexus" between him and the firearms to establish that he constructively possessed them. He relies on United States v. Mills, 29 F.3d 545, 549 (10th Cir. 1994).

In Mills, however, we addressed the requirement for proving that a defendant "knowingly possessed" a weapon for purposes of a conviction under 18 U.S.C. § 922. By contrast, the sentencing enhancement at issue here only requires that the weapon "was possessed," and a court should apply the enhancement "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. n.3. The government must show by a preponderance of the evidence that "a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant . . . ." United States v. Pompey, 264 F.3d 1176, 1180 (10th Cir. 2001) (quotation omitted). If it does so, the burden shifts to the defendant, who must demonstrate that this connection is "clearly improbable." Id. at 1181.

We conclude that the government has established the requisite temporal and spatial relationship. The police searched Mitchell's house shortly after McJunkins traded a weapon for drugs. During the search of the house, police found two guns and a variety of drugs. Randon was found in the house at the time of the search along with the drugs and the black nine-millimeter pistol that McJunkins had traded for drugs. Trial testimony indicated that Randon knew about and actually handled this weapon. In addition, the second firearm discovered during the March 31 search was found in Randon's truck. The government introduced evidence that he had previously claimed ownership of this weapon during his encounter with Officer Johnson. Mitchell stated that on March 31, Randon and Brandon had driven the truck to his house while carrying drugs, and thus the presence of the gun was related to the drugs later found in the house.[9] Randon has not indicated how the connection between his drug trafficking activities and these weapons is "clearly improbable." Accordingly, we affirm the application of the § 2D1.1 sentencing enhancement.

---

[9] Mitchell also stated that Brandon took possession of the gun that McJunkins had traded for drugs. In a drug conspiracy case, the firearm enhancement may be applied to a defendant even if the gun was possessed by a coconspirator. Pompey, 264 F.3d at 1181. Accordingly, Randon is also eligible for the enhancement because of Brandon's possession of a gun.

**III**

For the foregoing reasons, the judgment of the district court is

**AFFIRMED**.  Randon's motions to file a supplemental brief and to withdraw his

attorney are **GRANTED**.