**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOANNA ZARATE-SUAREZ,

    Defendant - Appellant.

No. 19-1203
(D.C. No. 1:18-CR-00266-PAB-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **PHILLIPS**, and **MORITZ**, Circuit Judges.[**]
_____

Joanna Zarate-Suarez appeals her sentence, arguing that the district court erred

by applying a two-level enhancement under the United States Sentencing Guideline

(U.S.S.G. or the Guidelines) § 2D1.1(b)(2) for directing the use of violence and a

four-level enhancement under U.S.S.G. § 3B1.1(a) for her role as an organizer or

leader of the conspiracy. Because Zarate-Suarez failed to preserve her objection to

the violence enhancement, we review this argument for plain error and hold that the

district court did not plainly err by applying that enhancement. And because she

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. But it may be cited for its
persuasive value. _See_ Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

[**] The Honorable Monroe G. McKay heard oral argument in this appeal, but he
passed away on March 28, 2020, before the resolution of this case. The Honorable
Harris L Hartz replaced him on the panel.

preserved her objection to the leader enhancement, we review this argument for clear error and hold that the district court did not clearly err when applying that enhancement. Accordingly, we affirm Zarate-Suarez's sentence.

## Background

This case arises from a conspiracy to distribute methamphetamine from October 2016 to May 2018. The government's primary witness was Christina Fitzgerald, a member of the conspiracy who pleaded guilty and agreed to cooperate with the government. Fitzgerald testified that she contacted Zarate-Suarez in October 2016, seeking to obtain two pounds of methamphetamine for Chris Karten. According to Fitzgerald, she and Karten planned to meet Zarate-Suarez's courier, Jeremiah Serr (a coconspirator charged in this case), in Kansas City, which was about halfway between Fitzgerald's home in Virginia and Zarate-Suarez's home in Colorado. Zarate-Suarez advised Fitzgerald that the courier would arrive in a silver Honda, but he did not show up. Zarate-Suarez later explained to Fitzgerald that Serr failed to arrive because he was stopped by law enforcement. This unexpected occurrence generated a change of plans—instead of completing their drug transaction in Kansas City, Fitzgerald and Karten drove to Colorado where they obtained the methamphetamine from Zarate-Suarez and another of the coconspirators, Edwin Roman-Acevedo. Because Fitzgerald drove to Colorado, Zarate-Suarez agreed to lower the price of the methamphetamine.

Fitzgerald further testified that she contacted Zarate-Suarez again in November 2016, seeking more methamphetamine for Karten. This time, Fitzgerald flew to

2

Colorado with Karten's girlfriend, Sarah MaGuire; they brought along $16,000 in cash. But Zarate-Suarez decided, along with Fitzgerald and another coconspirator, Omar Gonzalez-Hernandez (Zarate-Suarez's husband), to rob MaGuire of the $16,000. Roman-Acevedo and two other men drove MaGuire away from the hotel, under the guise of buying cigarettes. They then assaulted her and abandoned her by the side of the road. Meanwhile, Fitzgerald took all MaGuire's belongings and the $16,000 in cash from their hotel room, and Zarate-Suarez and Gonzalez-Hernandez drove Fitzgerald to a different hotel. Zarate-Suarez later divided up the cash, giving Fitzgerald $500 and each of the men who assaulted and abandoned MaGuire a bit less than that. Zarate-Suarez kept the remainder of the $16,000 for herself.

Fitzgerald said that Karten contacted her again in early 2018, this time seeking six pounds of methamphetamine. Unbeknownst to Fitzgerald, Karten was now a law enforcement informant. Fitzgerald contacted Zarate-Suarez, who said she could provide five pounds of methamphetamine. In May 2018, Fitzgerald flew to Denver where she met with Zarate-Suarez and Gonzalez-Hernandez, and the three tried but failed to meet with Karten to complete the deal. The next day, Zarate-Suarez, Fitzgerald, and Roman-Acevedo attempted to meet with Karten again. On this occasion, law enforcement stopped their vehicle and a drug dog alerted to their car. Zarate-Suarez, who was driving, attempted to flee; she engaged in a high-speed car chase during which she, Fitzgerald, and Roman-Acevedo tried to dissolve the methamphetamine in water and throw it out the vehicle's windows.

3

The government charged Zarate-Suarez, Fitzgerald, Roman-Acevedo, Gonzalez-Hernandez, and Serr with conspiring to distribute methamphetamine. In relevant part, it further charged Zarate-Suarez with possessing methamphetamine with intent to distribute in October 2016 and in May 2018. Zarate-Suarez pleaded guilty to all three counts.[1]

The district court concluded that Zarate-Suarez's total offense level was 41; with a criminal-history category of III, her sentencing range under the Guidelines was 360 months to life in prison. In so doing, it overruled Zarate-Suarez's objections to two sentencing enhancements, one for directing the use of violence in connection with a drug-trafficking crime and one for being the leader or organizer of the conspiracy. *See* U.S.S.G. § 2D1.1(b)(2) (creating two-level enhancement for directing use of violence in furtherance of drug trafficking); U.S.S.G. § 3B1.1(a) (creating four-level enhancement if individual was leader of conspiracy). The district court further rejected Zarate-Suarez's argument for a downward variance to the statutory minimum of 180 months. Ultimately, the district court sentenced Zarate-Suarez to 240 months in prison. Zarate-Suarez appeals.

**Analysis**

Zarate-Suarez challenges the district court's decision to impose the violence

---

[1] Fitzgerald and Roman-Acevedo also pleaded guilty. The government tried Serr and Gonzalez-Hernandez together, and the jury convicted them both. Afterward, Serr and Gonzales-Hernandez separately appealed their convictions. *See United States v. Serr*, No. 19-1197, 2020 WL 3095902, at *1 (10th Cir. June 11, 2020); *United States v. Gonzalez-Hernandez*, No. 18-CR-00266-PAB-4, 2019 WL 1922081, at *1 (D. Colo. Apr. 30, 2019), *appeal docketed,* No. 19-1226 (June 24, 2019).

and leader enhancements. "We review the district court's legal conclusions under the Guidelines de novo and its findings of fact for clear error, giving great deference to the district court's application of the Guidelines to the facts." *United States v. Evans*, 782 F.3d 1115, 1117 (10th Cir. 2015) (quoting *United States v. Salas*, 756 F.3d 1196, 1204 (10th Cir. 2014)). Generally, "[a] district court's conclusion that a defendant qualifies for an enhancement . . . is a factual determination that we review for clear error." *United States v. Rubio-Sepulveda*, 781 F. App'x 769, 771 (10th Cir. 2019) (unpublished). "Factual findings are clearly erroneous only if they are without factual support in the record or if this court, considering all the evidence, is left with a definite and firm conviction that a mistake has been made." *United States v. Lozano*, 921 F.3d 942, 946 (10th Cir. 2019).

## I.     Violence Enhancement

Zarate-Suarez first argues that the district court erred in applying the two-level violence enhancement in § 2D1.1(b)(2). This enhancement applies if "the defendant used violence, made a credible threat to use violence, or directed the use of violence" in a drug-trafficking crime. § 2D1.1(b)(2). The district court imposed this enhancement over Zarate-Suarez's objection. Specifically, the district court found that even though Zarate-Suarez did not explicitly direct the men to use violence when robbing MaGuire, she should have known that it was reasonably foreseeable that they would use violence to carry out her robbery plan. R. vol. 3, 68; *see also*

5

§ 1B1.3(a)(1)(B) (providing that relevant conduct for "jointly undertaken criminal activity" includes "all acts . . . of others that were . . . reasonably foreseeable").[2]

In finding the violence to have been reasonably foreseeable to Zarate-Suarez, the district court first noted that Zarate-Suarez created the plan to rob MaGuire and that robbery was a type of crime in which the use of violence was reasonably foreseeable. It further noted that it was reasonably foreseeable that MaGuire would resist being left behind, thereby requiring some kind of force to overcome that resistance. Additionally, the district court noted that after the men bragged about assaulting MaGuire to Zarate-Suarez, she simply paid each of them for their work. The district court construed this payment as Zarate-Suarez's "affirmation . . . that what they did by beating [MaGuire] up was within the scope of what Ms. Zarate-Suarez foresaw when she had them [rob MaGuire]." R. vol. 3, 70. The court thus imposed the § 2D1.1(b)(2) enhancement based on Zarate-Suarez's direction to the two men to rob MaGuire and the fact that it was reasonably foreseeable that the men would use violence in carrying out that direction.

---

[2] The dissent seeks to reframe the issue as whether Zarate-Suarez must personally direct the use of violence. *See* Dissent 6. The dissent's framing confuses its true dispute with the district court's conclusion. Zarate-Suarez directed a plan that resulted in violence, but her directive did not *expressly* call for violence. Thus, the dispute is whether a direction which does not expressly call for violence can nevertheless constitute a direction to use violence under § 2D1.1(b)(2) if the violence that resulted from that direction was reasonably foreseeable. The district court determined that § 2D1.1(b)(2) includes reasonably foreseeable violence. The dissent disagrees. We do not weigh in on this dispute because, for the reasons explained below, it is not properly before this court.

6

On appeal, Zarate-Suarez first argues that the district court erred by applying a reasonably foreseeable standard. According to Zarate-Suarez, the correct standard is whether she used violence, intended to use violence, or intentionally directed the use of violence.[3]

## A. Invited Error

But before we consider Zarate-Suarez's argument, we note that the government contends that even if the district court erred by applying the reasonably foreseeable standard, Zarate-Suarez invited that error. And therefore, the government argues, this court is precluded from considering the asserted error on appeal. *See United States v. Carrasco-Salazar*, 494 F.3d 1270, 1272 (10th Cir. 2007) ("[W]aiver bars a defendant from appealing an invited error.").

There is some merit to the government's position. The presentence investigation report (PSR) recommended application of the violence enhancement, but it did so based on Zarate-Suarez's "involvement in [MaGuire's] kidnapping." R. vol. 2, 15; *see also id.* at 31 ("[I]t is important to note the defendant devised a plan to kidnap another person and split the money with those who carried it out for her). Notably, the PSR did not discuss whether the violence was reasonably foreseeable, nor did it mention § 1B1.3(a)(1)(B) in its discussion of this enhancement.

---

[3] We note that Zarate-Suarez never clearly articulates what her intent-based standard means or why her proposed standard would preclude a court from considering reasonable foreseeability. In fact, Zarate-Suarez contradicts her position in her opening brief that a reasonably foreseeable analysis is "misplaced," Aplt. Br. 29, by conceding in her reply brief that reasonable foreseeability is "one appropriate consideration," Rep. Br. 2.

Instead, our review of the record on appeal shows that Zarate-Suarez herself introduced the discussion of a reasonably foreseeable standard under § 1B1.3(a)(1)(B). Zarate-Suarez's written objection to the PSR, argued, among other things, that the evidence was "insufficient" to sustain the use of violence enhancement under § 2D1.1(b)(2). R. vol. 1, 38. In a one-paragraph argument, Zarate-Suarez first asserted that "[t]here is insufficient evidence, even under a preponderance of the evidence standard, that Ms. Zarate-Suarez used violence, made a credible threat to use violence, or directed the use of violence." *Id.* But Zarate-Suarez then proceeded to suggest that "[u]nder the relevant conduct standard of § 1B1.3(a)(1)(B), the assault of [MaGuire] *would have to be 'reasonably foreseeable' to Ms. Zarate-Suarez in order for the enhancement" to apply*. *Id.* at 38–39 (emphasis added). Zarate-Suarez then devoted a full page to her argument about why the evidence was insufficient to show that she could have reasonably foreseen the assault. Significantly, she concluded her written objection to the § 2D1.1(b)(2) enhancement by stating that because she could not have reasonably foreseen the assault, "no sentencing enhancement is warranted under § 2D1.1(b)(2)." *Id.* at 40. Likewise, on the first day of the two-day sentencing hearing, Zarate-Suarez's counsel argued that the assault of MaGuire was "not something that was reasonably foreseeable." R. vol. 3, 42–43. And then, on the second day of the hearing, when the government presented its arguments in favor of the enhancement, the prosecutor began by reminding the court that Zarate-Suarez's counsel had framed the issue in terms of whether the violence was reasonably foreseeable: "Your Honor, I think the

issue as it was framed at the last hearing, which I think is appropriate, is the foreseeability of the use of violence." R. vol. 3, 63. Zarate-Suarez's counsel did not object—either to that framing or to the discussion of reasonable foreseeability that followed.

In her reply brief, Zarate-Suarez fails to address or even acknowledge that her written objection introduced the reasonable foreseeability standard for the first time. Instead, she simply concedes that she argued at the sentencing hearing that the evidence was insufficient to apply the enhancement under a reasonable foreseeability standard. But she now suggests that, with this argument, she only intended to concede that reasonable foreseeability was "one appropriate consideration." Rep. Br. 2. We see no support in the record for Zarate-Suarez's current position that she argued only that reasonable foreseeability was "one appropriate consideration." *Id.* Rather, as noted above, she repeatedly framed her ultimate objection in terms of whether Zarate-Suarez could have reasonably foreseen the violence.

Thus, the government makes a strong argument that Zarate-Suarez invited the error she now complains about. *See Thornton*, 846 F.3d at 1117 n.3. But even if Zarate-Suarez did invite the error, we may nevertheless exercise our discretion to consider the merits of her argument. *See id.* (noting that invited error is a type of waiver); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 675 (10th Cir. 1998) (exercising discretion to reject waived argument on merits). And we do so under plain-error review because Zarate-Suarez clearly did not object to the application of

9

the reasonably foreseeable standard.[4] *See United States v. Hubbard*, 603 F.2d 137, 142 (10th Cir. 1979) (stating that plain-error review is appropriate where party fails to make "objection with clarity and specificity").

### B.      Plain Error

Under plain error, we reverse the district court only if Zarate-Suarez demonstrates that the application of the reasonably foreseeable standard is "(1) [an] error, (2) that is plain, (3) that affects substantial rights, and (4) that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. De Vaughn*, 694 F.3d 1141, 1159 (10th Cir. 2012).

Here, although it is her burden to do so, Zarate-Suarez makes no showing as to why the district court's application of the reasonably foreseeable standard constitutes plain error.[5] And her failure to carry her burden on this point is dispositive. *Id.*

But even if we continued the plain-error analysis, we would affirm. That's because even if we assume the district court erred in applying the reasonably foreseeable standard, that error was not plain. An error is "plain" under the second

_____

[4] The dissent would conclude that Zarate-Suarez's insufficient-evidence argument preserved her challenge to the reasonably foreseeable standard. And it describes her insufficient-evidence argument and her reasonably foreseeable arguments as "independent and distinct." Dissent 5 n.4. But not even Zarate-Suarez frames her arguments in this manner. Instead, Zarate-Suarez concedes that she argued to the district court that reasonable foreseeability was "one appropriate consideration." Rep. Br. 2. Moreover, the label we assign to Zarate-Suarez's arguments is immaterial because the substance of her arguments is clear. Zarate-Suarez never said that she isn't responsible for reasonably foreseeable violence. She argued only that the resulting violence wasn't reasonably foreseeable.

[5] Zarate-Suarez even failed to make a plain-error argument in her reply brief after the government asserted on appeal that she invited the error.

10

prong of plain-error review only if it is "clear or obvious" under "well-settled law." *United States v. Whitney*, 229 F.3d 1296, 1309 (10th Cir. 2000).[6] Zarate-Suarez cites no well-settled law to support her argument that § 2D1.1(b)(2) applies only where a defendant used or "intended to use" violence. Instead, she first relies on her own interpretation of comment 11(B) to § 2D1.1(b)(1) and (2). But that comment merely describes the interaction between the enhancement the district court applied to Zarate-Suarez, § 2D1.1(b)(2), and the enhancement from § 2D1.1(b)(1), which applies to defendants who possessed a dangerous weapon during the commission of certain crimes. *See* § 2D1.1(b) cmt. n.11(B). And while the Guidelines' commentary can be authoritative, comment 11(B) says nothing about whether (b)(2) requires application of an "intent" test versus a reasonably foreseeable test. *See United States v. Nacchio*, 573 F.3d 1062, 1066–67 (10th Cir. 2009) (describing interpretive weight of Guidelines comments). Moreover, the district court did not apply the (b)(1)

---

[6] Generally, well-settled law means either a Tenth Circuit or Supreme Court case addressing the issue. *United States v. Salas*, 889 F.3d 681, 687 (10th Cir. 2018). But as the dissent notes, "error can be plain based on the text of statutes or Guidelines." Dissent 14; *see also United States v. Fagatele*, 944 F.3d 1230, 1239 (10th Cir. 2019) (noting that defendant can show plain error by demonstrating that his or her interpretation is "clearly and obviously" correct; but finding that defendant's interpretation was not plain (quoting *United States v. Brown*, 316 F.3d 1151, 1158 (10th Cir. 2003))). Notably, the dissent does not truly present a plain-meaning argument. Although the dissent styles its interpretation as a plain-meaning interpretation, its interpretation is not restricted to the text of either § 2D1.1(b)(2) or § 1B1.3. Dissent 6–7. Instead, the dissent relies on extratextual evidence—such as training manuals, comments to other Guidelines, and cases interpreting those comments to other Guidelines—to substantiate its interpretation. *Id.* at 7 n.6, 10–12.

11

enhancement to Zarate-Suarez. Thus, any interaction between the enhancement in (b)(1) and the enhancement in (b)(2) is irrelevant.

Next, to support her application of an "intent" test, Zarate-Suarez points to three out-of-circuit cases discussing § 2D1.1(b)(2). *See United States v. Pineda-Duarte*, 933 F.3d 519, 522 (6th Cir. 2019); *United States v. Fernandez*, 636 F. App'x 71, 74 (2d Cir. 2016) (unpublished); *United States v. Walker*, 578 F. App'x 812, 820 (11th Cir. 2014) (unpublished).But none of those cases actually considered the application of her proposed standard against a reasonably foreseeable standard. *See Fernandez*, 636 F. App'x at 74; *Walker* 578 F. App'x at 820. In *Fernandez* the defendant shot a victim and threatened to harm another. 636 F. App'x at 74. Similarly, in *Walker* the defendant punched a coconspirator and threatened others. 578 F. App'x at 820. In both cases, the courts upheld the enhancement because the evidence showed that the defendants themselves both used violence and threatened to use violence. These cases have little relevance here because the parties all agree that Zarate-Suarez herself did not use violence.

Zarate-Suarez also cites, without elaboration, *Pineda-Duarte*. That case contains a more robust discussion of a defendant's intent. 933 F.3d at 522. But that discussion considers whether the enhancement applied to a defendant who swung a shovel at—but missed—a law enforcement officer. *Id*. Again, *Pineda-Duarte* has no application here, where we must consider whether the violence that actually occurred is fairly attributable to Zarate-Suarez under § 2D1.1(b)(2). In sum, neither comment

12

11(B) nor the out-of-circuit cases support Zarate-Suarez's position that § 2D1.1(b)(2) applies only if she intended to either use or direct the use of violence.

On the other hand, the government points to *United States v. Torres*, an out-of-circuit case that applied the reasonably foreseeable standard to § 2D1.1(b)(2). 694 F. App'x 937, 942 (5th Cir. 2017) (unpublished). *Torres*, like the cases cited by Zarate-Suarez, did not weigh the reasonably foreseeable standard against Zarate-Suarez's proposed standard. But the court in *Torres*, like the district court here, applied a reasonably foreseeable standard after discussing circumstances that did not include direct evidence of intent. *See id.*(concluding defendant could reasonably foresee that gang members would use violence because he interacted with violent gang over "long period of time"; "distributed, received, and stored drugs, and received drug money" for the gang; and was present when gang member held someone at gunpoint). Zarate-Suarez fails to acknowledge *Torres* or the other cases the government cites in her reply brief, much less argue why we should afford more weight to her proposed authority. And regardless, even though none of the cases cited by the parties contain a robust discussion of the proper standard for applying § 2D1.1(b)(2), the competing authority makes clear that the district court's application of the reasonably foreseeable standard was not "clear or obvious" error under "well-settled law." *Whitney*, 229 F.3d at 1309; *see also Rice v. Office of Servicemembers' Grp. Life Ins.*, 260 F.3d 1240, 1249 (10th Cir. 2001) (declining to find plain error in light of "conflicting authority").

Nevertheless, the dissent would conclude that the district court not only erred, but that the error was plain. And the dissent suggests that the district court's application of the reasonably foreseeable standard was error because § 1B1.3(a) applies "[u]nless otherwise specified," and § 2D1.1(b)(1) is "otherwise specified." Dissent 7 (quoting § 1B1.3(a)). But the dissent cites no case, let alone a controlling case, interpreting the violence enhancement in this manner. *See Salas*, 889 F.3d at 687. Instead, the cases cited by the dissent—cases neither party cites—do not address the violence enhancement. Dissent 10–12. (discussing cases examining enhancements from U.S.S.G. § 3C1.2 and U.S.S.G. § 5C1.2). And even if these cases would bear on our analysis of a different Guideline, they simply reinforce the existence of potentially conflicting authority on this issue. *See Rice*, 260 F.3d at 1249. Thus, we conclude that even if the district court erred in applying a reasonable foreseeability standard, it did not plainly err.

## C. Clear Error

Finally, Zarate-Suarez argues that even if reasonable foreseeability is the applicable test, the facts do not support finding as much here. We review the district court's application of a Guideline to the facts for clear error. *Evans*, 782 F.3d at 1117. Zarate-Suarez's position—that she could not reasonably foresee that MaGuire would resist being abandoned such that violence would be used to complete the robbery—is contradicted both by the nature of the crime itself as well as by the record. As the district court noted, robbery, by its nature, is a potentially violent crime. And the potential for violence was particularly foreseeable here.

14

Zarate-Suarez's plan was to lure the unsuspecting MaGuire away from her belongings—including the $16,000 she brought to pay for the methamphetamine—and to abandon her alone, at night, in an unfamiliar place. As such, it is entirely predictable that MaGuire would resist being left behind and separated from her $16,000. And as a result, it is reasonably foreseeable that violence would be necessary to effectuate Zarate-Suarez's plan to rob MaGuire. Moreover, the government points to evidence that before the assault, one of the men suggested to Zarate-Suarez that if MaGuire refused to cooperate, they would force her out of the car. In sum, the record supports the district court's decision to apply this enhancement, and we are not "left with a definite and firm conviction that a mistake has been made." *Lozano*, 921 F.3d at 946. Thus, the district court did not clearly err in imposing this enhancement.

## II. Leader Enhancement

Zarate-Suarez next argues that the district court erred in imposing a four-level enhancement based on her role as an organizer or leader of the conspiracy under § 3B1.1(a). Generally, § 3B1.1 provides for a sentencing enhancement where the defendant played an "[a]ggravating [r]ole" in the offense. And as relevant to this case, § 3B1.1(a)'s four-level enhancement applies "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or

15

was otherwise extensive."[7]

"[T]he gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals." *United States v. Sallis*, 533 F.3d 1218, 1223 (10th Cir. 2008) (quoting *United States v. Torres*, 53 F.3d 1129, 1142 (10th Cir. 1995)). Various factors can indicate the requisite level of control, including that the defendant (1) recruited others, employed others, or controlled the activities of others; (2) "paid others for their efforts on behalf of the conspiracy"; (3) "restricted the people to whom other coconspirators could sell their drugs"; and (4) "controlled the manner of sales, set prices, or claimed the right to a larger share of proceeds." *Id.* (quoting *United States v. Anderson*, 189 F.3d 1201, 1212 (10th Cir. 1999)); *see also* § 3B1.1 cmt. 4 (listing similar relevant factors). But a defendant need not meet each one before qualifying for the enhancement. *See United States v. Wacker*, 72 F.3d 1453, 1476 (10th Cir. 1995) ("The Guidelines do not require that each of these factors be satisfied for a [§] 3B1.1 enhancement to apply.").

The district court applied these factors and, over Zarate-Suarez's objection, imposed the leader enhancement, determining that Zarate-Suarez "exercise[d] decision[-]making authority during the course of this particular conspiracy." R. vol. 3, 78. In support, the district court found that Zarate-Suarez made the decision to rob MaGuire and that Zarate-Suarez doled out the money from that robbery, keeping the

---

[7] The district court found that the conspiracy involved five or more participants. Zarate-Suarez does not challenge that conclusion on appeal, so we do not address it further.

16

majority of it for herself. It further found that as to the final transaction in this conspiracy, Zarate-Suarez was "the shot caller." *Id.* at 80. Thus, it concluded that Zarate-Suarez was "the leader or organizer" of this conspiracy and imposed the four-level enhancement. *Id.* Like the violence enhancement, the district court's decision to apply the leader enhancement "is a factual determination that we review for clear error." *Rubio-Sepulveda*, 781 F. App'x at 771.

On appeal, Zarate-Suarez argues that her role did not warrant a § 3B1.1(a) enhancement. In support, she relies on *Rubio-Sepulveda* for the proposition that § 3B1.1(a) enhancements require a "heightened level of leadership and control." 781 F. App'x at 774. In *Rubio-Sepulveda*, the majority determined that the district court clearly erred in imposing the § 3B1.1(a) enhancement because the defendant's degree of control and authority did not rise to the level of being a leader or organizer.[8] *Id.* at 773. But *Rubio-Sepulveda* is a nonprecedential case that can be distinguished on its facts. There, the evidence showed that the defendant acted essentially as a middleman: "he operated a 'source phone' through which he received drug delivery requests from various dealers in the conspiracy and either fulfilled those requests himself or else 'dispatched' someone to make those deliveries at meetings he scheduled." *Id.* (quoting R. vol. 7, 91–92, 304–05). And according to the majority, the evidence did not show that the defendant recruited anyone, employed anyone,

_____

[8] One judge dissented, concluding that although he might have weighed the evidence differently than the district court, the case did not meet the standard for clear error. *See Rubio-Sepulveda*, 781 F. App'x at 778–79 (Kelly, J., dissenting).

17

paid anyone, controlled the manner of sales, set prices, or claimed the right to a larger share of the proceeds. *Id.* at 774.

In contrast, Zarate-Suarez was more than a middleman or mere supplier, and the majority of factors here favor applying the enhancement. For example, Zarate-Suarez "paid others for their efforts on behalf of the conspiracy" by dividing MaGuire's stolen money between herself, Fitzgerald, and the men who assaulted MaGuire. *Sallis*, 533 F.3d at 1223 (quoting *Anderson*, 189 F.3d at 1212). That same evidence also showed that she "claimed the right to a larger share of [the] proceeds" by keeping the majority of stolen money for herself. *Id.* (quoting *Anderson*, 189 F.3d at 1212). Further, the record includes evidence that Zarate-Suarez set prices; for instance, in the first transaction of the conspiracy, Zarate-Suarez lowered Fitzgerald's price for methamphetamine because Fitzgerald drove all the way to Colorado to pick it up. *See id.* (noting that setting prices indicates control). Additionally, the evidence suggested Zarate-Suarez directed Serr to deliver a pound of methamphetamine to Fitzgerald in Kansas City. *See id.* (noting that directing others indicates control). And while Zarate-Suarez correctly points out that she did not recruit anyone to the conspiracy or restrict the buyers, the absence of some factors showing control does not automatically preclude the leadership enhancement. The factors governing this analysis are just that—factors. *See Wacker*, 72 F.3d at 1476. And we weigh all factors in the context of the overarching question: whether Zarate-Suarez had "control, organization, and responsibility for the actions of other individuals." *Sallis*, 533 F.3d at 1223. Here, the evidence was not so lacking that the district court clearly

18

erred when it determined that Zarate-Suarez was a leader or organizer for purposes of the § 3B1.1(a) enhancement. *See Lozano*, 921 F.3d at 946.

## Conclusion

Because the district court did not err in imposing either the violence enhancement or the leader enhancement, we affirm.

Entered for the Court


Nancy L. Moritz
Circuit Judge

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 18, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOANNA ZARATE-SUAREZ,

    Defendant - Appellant.

No. 19-1203
(D.C. No. 1:18-CR-00266-PAB-1)
(D. Colo.)

_____

**PUBLISHED DISSENT**
_____

**PHILLIPS**, Circuit Judge.
_____

I concur with the majority's affirming the district court's application of the

aggravating-role adjustment, United States Sentencing Guidelines Manual (U.S.S.G.)

§ 3B1.1(a). But I dissent with its affirming the district court's application of the use-of-

violence specific offense characteristic, located at § 2D1.1(b)(2).

## BACKGROUND

Zarate-Suarez headed a multi-pound-methamphetamine conspiracy in Denver,

Colorado. She pleaded guilty to three drug counts, the first for conspiracy, the second and

third for possession with intent to distribute. The district court sentenced her to 20 years

of imprisonment.

This appeal involves a small subset of the case's facts: One of Zarate-Suarez's out-of-state customers sent his girlfriend to Colorado with $16,000 to buy three pounds of methamphetamine from Zarate-Suarez. Sometime before the sale, Zarate-Suarez devised a more profitable plan. She enlisted three male underlings to invite the girlfriend on a late-night cigarette run. The underlings would then abandon her at the gas station when she got out of the car. This would enable Zarate-Suarez and others the needed time to enter the girlfriend's hotel room and steal the $16,000. All went according to plan until on arriving at the gas station the girlfriend merely pulled her seat forward to let one of the men out and refused to get out herself. That led to one of the men assaulting her and removing her from the car. The three men returned to Zarate-Suarez, and she divided the $16,000, keeping most of it for herself.[1]

After Zarate-Suarez pleaded guilty to all charges, a probation officer prepared a presentence report (PSR). The PSR recommended a two-offense-level enhancement under the specific offense characteristic located at U.S.S.G. § 2D1.1(b)(2), which applies when "the defendant" has "used violence, made a credible threat to use violence, or directed the use of violence." The PSR's one-paragraph justification for the enhancement reads as follows:

> **47. Specific Offense Characteristics:** Pursuant to §2D1.1(b)(2), if the defendant used violence, made a credible threat of violence, or directed the use of violence, increase by two levels. The undersigned considered the offense in which the female courier was kidnapped and [Zarate-Suarez], along with Fitzgerald, "devised" the plan. [Zarate-Suarez] also split the

---

[1] As for Zarate-Suarez's reaction after hearing about the men having physically assaulted the girlfriend, the district court acknowledged that none of the attorneys had ever asked about that.

2

money with those who kidnapped the female courier. Due to [Zarate-Suarez's] involvement in this kidnapping, a two-level increase was applied.

R. vol. 2 at 16. In her Objection to Presentence Investigation Report, Zarate-Suarez opposed the enhancement on two grounds. First, she argued that the government had offered insufficient evidence to meet the specific terms of § 2D1.1(b)(2):

> There is insufficient evidence, even under a preponderance of the evidence standard, that Ms. Zarate-Suarez used violence, made a credible threat to use violence, or directed the use of violence. Ms. Zarate-Suarez was not present when [the girlfriend] was beaten. There is insufficient evidence that Ms. Zarate-Suarez directed anyone to commit violence. No witness with personal knowledge has ever alleged that Ms. Zarate-Suarez was involved in a plan to *kidnap* or *assault* [the girlfriend].

R. vol. 1 at 38.

Second, immediately after this, Zarate-Suarez opposed the PSR's basis for imposing the enhancement—her involvement in the "kidnapping,"[2] in which her underlings (not she) had used violence. By deeming Zarate-Suarez responsible for the violent acts of others, the PSR departed from the plain text of § 2D1.1(b)(2), which limits a defendant's responsibility to her own acts. In doing so, the PSR necessarily (though silently) jumped to a different guideline, which, when applicable, allows a sentencing court to hold a defendant responsible for the conduct of others. *See* U.S.S.G. § 1B1.3(a)(1)(B).

---

[2] At the sentencing hearing, Zarate-Suarez's counsel stated, "I also do want to point out that while the words 'kidnap' and 'robbery' keep getting thrown out, I don't think they are intended as the legal definition, and I would point out there was no robbery. Nothing was taken from the person or presence of [the girlfriend] and it was not a kidnap. She chose to leave. Although she was left at the gas station, she chose to get into the vehicle and go there to get cigarettes." R. vol. 3 at 42:16–22.

On this point, Zarate-Suarez disputed as a factual matter one of § 1B1.3(a)(1)(B)'s prerequisites—that the acts of the others had been reasonably foreseeable to her:

> Under the relevant conduct standard of § 1B1.3(a)(1)(B), the assault of [the girlfriend] would have to be "reasonably foreseeable" to Ms. Zarate-Suarez in order for the enhancement at § 2D1.1(b)(2) to be applicable. The assault was not reasonably foreseeable to Ms. Zarate-Suarez.

R. vol. 1 at 38–39. In this regard, Zarate-Suarez spent a page disputing that the others' violence was reasonably foreseeable to her. She explained that she and her underlings had planned to abandon the girlfriend at the gas station when the girlfriend got out to buy cigarettes; that the plan had faltered when the girlfriend stayed in the car, leaning her car seat forward to let one of the men out and refusing to get out; and that in this unexpected situation the underlings spontaneously assaulted the girlfriend and removed her from the car. *Id.* at 39–40.

At the sentencing hearing, Zarate-Suarez repeated her arguments. First, Zarate-Suarez's counsel argued that the government had presented insufficient evidence of her personal involvement in the assault, as required by § 2D1.1(b)(2). On this point, counsel noted that Zarate-Suarez had not been present at the assault, and further declared that "[t]here is absolutely no evidence that she directed anyone or told anyone or suggested to anyone that violence should occur." R. vol. 3 at 42:13–15. Second, counsel noted that "I do think that this is not something that was reasonably foreseeable to Ms. Zarate either," *id.* at 42:25–43:1, later adding that "the assault itself was the spontaneous conduct of

4

these men, and in no way did Ms. Zarate ever suggest that that should happen,"[3] *id.* at 46:3–5.

On appeal, Zarate-Suarez has continued to maintain her district-court arguments. Addressing the first argument, she states as follows:

> The [District] Court's focus on the foreseeability of whether violence might occur, however, is misplaced. Indeed, we have been unable to uncover any decision in which a court has applied a foreseeability requirement to determine whether a defendant used violence, made a credible threat to use violence, or directed the use of violence in the course of committing a drug-trafficking offense.

Br. of Appellant at 29. She describes the "key question" as being "whether the defendant used violence, intended to use violence or directed the use of violence." *Id.* at 31. In this regard, she cites cases in which courts have imposed two offense levels under § 2D1.1(b)(2) against defendants who themselves had used violence (as opposed to others having done so). Addressing the second argument, Zarate-Suarez continues to

---

[3] For the first time on appeal, the government contends that the record belies that "the assault 'was simply spontaneous and independent conduct,'" and that it instead supports that one of the underlings had told Zarate-Suarez that if the girlfriend "wouldn't cooperate, 'they would kick her out of the car.'" Appellee's Br. at 8, 14. As it turns out, this information comes from a DEA interview of one of the three men on the cigarette run. The PSR did not include this information, the government did not mention it at the sentencing hearing, and the district court did not rely on it. And for good reason. The report notes how this man repeatedly changed his story on key points. Suppl. R. vol. 2 at 15 (describing the special agents' belief that the man "omitted information" and "openly provided false information" to the agents). Even if the district court had known about and found the man's statement credible, the statement would not justify a § 2D1.1(b)(2) enhancement. The man described a plan to trick the girlfriend into exiting the car to let one of the men in the back seat get out at the service station, but she leaned her seat forward instead. This plan shows an intent to *avoid* committing an assault. Certainly, this account does not show Zarate-Suarez directing that violence be used.

maintain that her underlings' assault on her customer's girlfriend was not reasonably foreseeable to her. She emphasizes that the plan had been to abandon the girlfriend at the gas station and that, when the girlfriend refused to get out of the car, the men spontaneously assaulted her and removed her from the car. Zarate-Suarez argues that she had no way of knowing that the girlfriend would be "dressed only in a blanket and flip flops and would refuse to get out because it was cold outside."[4] *Id.* at 32–33. Because Zarate-Suarez has preserved her objection to the district court's imposing two offense levels under § 2D1.1(b)(2), I would review de novo that question. *See, e.g.*, *United States v. Evans*, 782 F.3d 1115, 1117 (10th Cir. 2015) ("[W]e review the district court's legal conclusions under the Guidelines de novo and its findings of fact for clear error, giving great deference to the district court's application of the Guidelines to the facts." (citation and internal quotation marks omitted)).

## ANALYSIS

### I. U.S.S.G. § 2D1.1(b)(2)

Section 2D1.1(b)(2) reads as follows: "If the defendant used violence, made a credible threat to use violence, or directed the use of violence, increase by **2** levels." The

---

[4] The two arguments are independent and distinct. Any attempt to combine the first as part of the second would make no sense. After all, how would Zarate-Suarez's showing that she did not use violence, credibly threaten the use of violence, or direct the use of violence in turn show that the violent acts of other persons with whom she had jointly undertaken criminal activity would not be reasonably foreseeable to her? Plus, Zarate-Suarez referred to § 2D1.1(b)(2) in discussing her lack of personal participation, not to § 1B1.3(a)(1)(B).

6

district court did not find that Zarate-Suarez did any of these three things. So by the subsection's plain language, Zarate-Suarez is entitled to prevail.

## II.    U.S.S.G. § 1B1.3(a)(1)(B)

The district court erred by departing from the plain text of § 2D1.1(b)(2) and instead following the PSR's view that Zarate-Suarez was responsible for the two-offense-level enhancement because she had been "involved in the kidnapping" in which others had used violence. *See* § 1B1.3(a)(1)(B). But by requiring that Zarate-Suarez be the one using violence, credibly threatening violence, or directing violence, § 2D1.1(b)(2) unequivocally forecloses the district court from enhancing Zarate-Suarez's Guidelines calculation for others' conduct.

Here, it helps to step back and examine the workings of § 1B1.3(a)(1)(B). When applicable, that subsection applies in calculating base offense levels, specific offense characteristics, and adjustments "on the basis of the following:"

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

§ 1B1.3(a)(1)(B). But § 1B1.3(a)(1)(B) is inapplicable to § 2D1.1(b)(2).

All-important are the three words that begin § 1B1.3: "Unless otherwise specified." When a Guideline enhancement requires a showing that *the defendant* has done a specific act, the Guidelines have "otherwise specified" that § 1B1.3(a)(1)(B) does

7

not apply.[5] This only makes sense—§ 2D1.1(b)(2) requires that the defendant has used violence, credibly threatened violence, or directed violence, not that *someone else* has done so.[6] The Guidelines' text itself spells The End.

To activate § 1B1.3(a)(1)(B), the Sentencing Commission does not speak in terms of "the defendant did X, Y, or Z." After all, doing so would make no sense. Enhancements requiring that the defendant personally committed some act (like § 2D1.1(b)(2)'s "the defendant used violence") do not mix with § 1B1.3(a)(1)(B)'s application to conduct of other persons. Simply put, § 2D1.1(b)(2) considers only the defendant's conduct, and § 1B1.3(a)(1)(B) considers only conduct of persons other than the defendant. The two subsections are oil and water. By objecting that the government

---

[5] Though this is self-evident from the quoted Guidelines sections' text, the Sentencing Commission takes no chances with any misunderstandings. In its training materials for judges, probation officers, prosecutors, and defense counsel, the Commission states it this way: "One of the most common specifications otherwise [speaking to § 1B1.3's prefatory 'Unless otherwise specified'] is the use of the term '*defendant*' (as opposed to '*offense*') to limit relevant conduct in some considerations to the acts for which the defendant is directly responsible (as opposed to acts a co-participant may have done)." *Advanced Relevant Conduct*, U.S. Sentencing Comm'n 31 (2017), https://www.ussc.gov/education/training-resources/relevant-conduct-slideshows.

[6] *See also United States v. Pojilenko*, 416 F.3d 243, 248 (3d Cir. 2005) ("In our view, § 3B1.4 'specifie[s]' [referring to § 1B1.3(a)] that 'use of a minor' enhancements be individualized, and thus not based on the acts of co-conspirators," relying on the "if '*the defendant* used or attempted to use a person less than eighteen years of age'" language (first alteration in the original) (first quoting § 1B1.3(a); and then quoting § 3B1.4)); *United States v. Acosta*, 474 F.3d 999, 1002–03 (7th Cir. 2007) (adopting *Pojilenko*'s reasoning and rejecting three other circuits' application of § 1B1.3(a)(2) to § 3B1.4); *cf. United States v. Tagore*, 158 F.3d 1124, 1128–29 (10th Cir. 1998) (recognizing that a cross reference's applying if "the offense involved" implicates broader relevant conduct than does a specific offense characteristic applying if "'the defendant' engaged in a pattern of activity involving the sexual abuse or exploitation of a minor" (citation omitted)).

had offered insufficient evidence that *she herself* had used violence, credibly threatened violence, or directed the use of violence, Zarate-Suarez necessarily objected to the district court's enhancing her sentence based on the conduct of others under § 1B1.3(a)(1)(B). And she was well within her rights in arguing that the evidence did not show the violence of her underlings was reasonably foreseeable to her. She was free to do so in case the district court followed the PSR's mistaken course.

The Sentencing Commission uses different wording when allowing defendants to be held responsible for the conduct of others under § 1B1.3(a)(1)(B). A flip through the Guidelines Manual shows that it routinely does so. For instance, to increase the base offense level under § 2A1.4(a)(2)(A) for involuntary manslaughter, the Sentencing Commission requires that "the offense involved reckless conduct[.]" A reference to "the offense involved" is a dead giveaway. After all, the Guidelines provide that "'***Offense***' means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." § 1B1.1 cmt. n.1(I). So if § 2D1.1(b)(2) instead read, "If the offense involved the use of violence, a credible threat of violence, or a direction to use violence, increase by 2 levels," Zarate-Suarez might well be responsible for the two levels.[7] But the Sentencing Commission chose differently. That is, it chose to "specify otherwise" under § 1B1.3.

---

[7] *See* Thomas W. Hutchinson et al., *Federal Sentencing Law and Practice* 73 (2019 ed.) ("The Commission has defined the term 'offense' to mean 'the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context.' The Commission, therefore, cannot be otherwise specifying whenever it uses the term 'offense' in a chapter two or three guideline provision.").

Another way the Sentencing Commission words Guidelines enhancements to include other persons' conduct under § 1B1.3(a)(1)(B) is illustrated by § 2D1.1(b)(7): "If the defendant, or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct), distributed a controlled substance through mass-marketing by means of an interactive computer service, increase by **2** levels." Again, if § 2D1.1(b)(2) read, "If the defendant, or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct), used violence, made a credible threat of violence, or directed the use of violence," Zarate-Suarez might well receive the two-level enhancement. But the Sentencing Commission chose against using this formulation, again specifying otherwise.

Our circuit has decided two cases involving the very dynamic between "the defendant" and "unless otherwise specified" as raised in this case—albeit in individual commentary to two guideline sections. First, in *United States v. Pena-Sarabia*, 297 F.3d 983, 987–89 (10th Cir. 2002), we reviewed a defendant's eligibility for a safety-valve reduction under U.S.S.G. § 5C1.2. At issue was the second of five eligibility conditions, namely, that "the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense[.]" § 5C1.2(a)(2). Though Ms. Pena-Sarabia had not possessed a firearm, her codefendant husband had done so. 297 F.3d at 987. Despite this, the government contended that she "should nevertheless be held accountable for the foreseeable acts of her husband undertaken in their joint criminal activity." *Id.*

The court reviewed the district court's interpretation of § 5C1.2 as a question of law. *Id.* Among other things, the court considered the following language from § 5C1.2's

10

commentary section: "Consistent with § 1B1.3 (Relevant Conduct), the term *'**defendant**,'* as used in subdivision (2) [of § 5C1.2], limits the accountability of the defendant to his own conduct and conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused."[8] *Id.* at 987–88 (alteration in original) (quoting § 5C1.2 cmt. n.4) (internal quotation marks omitted). The court applied § 1B1.3's prefatory "Unless otherwise specified" as defeating the application of § 1B1.3(a)(1)(B). *Id.* at 988. In reaching this plain-text result, the court overruled *United States v. Hallum*, 103 F.3d 87 (10th Cir. 1996), which had disallowed safety-valve relief because of "another person's reasonably foreseeable possession of a firearm in furtherance of a joint criminal activity." *Id.* at 987–98 (citing *Hallum*, 103 F.3d at 90).[9]

Second, in *United States v. Conley*, 131 F.3d 1387 (10th Cir. 1997), we reviewed a district court's imposition of two offense levels under U.S.S.C. § 3C1.2, Reckless Endangerment During Flight. After a bank robbery, three robbers led police on a high-speed chase. *Id.* at 1388–89. The § 3C1.2 adjustment applies "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer[.]" *Id.* at 1389. As in *Pena-Sarabia*, the court quoted the Guideline's commentary section, which for § 3C1.2 provided that the "defendant [is] responsible for the reckless conduct of others only if he 'aided or

---

[8] This tracks the language of § 1B1.3(a)(1)(A).

[9] Because a panel is bound by the precedent of earlier panels, the court circulated the opinion to the en banc court. The en banc court voted unanimously to overrule *Hallum*. *Pena-Sarabia*, 297 F.3d at 989 n.2. The court noted that every other circuit to pass on the issue had rejected *Hallum*. *Id.* at 987–89.

11

abetted, counseled, commanded, induced, procured, or willfully caused' that conduct."

*Id.* at 1390 (quoting § 3C1.2 cmt. n.5). Though Conley had not driven the getaway car, we affirmed the district court's imposition of the two offense levels. *Id.* at 1391. We relied on PSR information indicating that Conley had encouraged the driver's reckless behavior. *Id.* We also relied on the inherent dangers of a high-speed escape from a bank robbery. *Id.* In this regard, we looked to Conley's aiding or abetting, counseling, commanding, inducing, procuring, or willfully causing the driver's reckless behavior. *Id.* In other words, we looked at what Conley himself had done leading up to the high-speed chase, because "[m]ere reasonable foreseeability of the reckless behavior at issue is not enough by itself to support a § 3C1.2 enhancement." *Id.* at 1390.

Unlike the Guidelines sections at issue in *Pena-Sarabia* and *Conley*, § 2D1.1(b)(2) contains no similar commentary note.[10] But this does not mean that the Sentencing Commission has authorized the district court to use § 1B1.3(a)(1)(B) in determining whether Zarate-Suarez herself "used violence, made a credible threat of violence, or directed the use of violence" under § 2D1.1(b)(2).[11] Again, the plain text of the two Guidelines sections establishes this. And a leading commentator our court has previously

---

[10] *See also* U.S.S.G. §§ 2K2.1 cmt. n.13(c), 2K3.1 cmt. n.1(A), 3B1.5 cmt. n.2.

[11] In its training materials for judges, probation officers, prosecutors, and defense counsel, the Commission states it this way: "The use of the term 'defendant' prohibits including relevant conduct based on the acts of others under § 1B1.3(a)(1)(B). NOTE: Defendant *is still accountable* for acts he/she committed, aided, abetted, counseled, commanded, induced, procured, and willfully caused at § 1B1.3(a)(1)(A)." *Advanced Relevant Conduct*, U.S. Sentencing Comm'n 33 (2017), https://www.ussc.gov/education/training-resources/relevant-conduct-slideshows.

12

relied on sees it the same way. *See* Thomas W. Hutchinson et al., *Federal Sentencing Law and Practice* 73 (2019 ed.) ("**Use of the term 'the defendant.'** The Commission does 'otherwise specify' whenever it uses the term 'defendant' in a chapter two or three guideline provision. Requiring that a determination be made on the basis of defendant's conduct is inconsistent with the relevant conduct rules of § 1B1.3(a) that make a defendant accountable for the conduct of others. The use of 'defendant,' therefore, otherwise specifies and precludes holding a defendant accountable for the conduct of others.").[12]

## III. Plain-Error Standard

### A. Why the Plain-Error Standard Does Not Apply.

The majority concludes that the plain-error standard governs Zarate-Suarez's § 2D1.2(b)(2) claim. It rules that she forfeited her argument that the district court erred by relying on the violent conduct of her underlings under § 1B1.3(b)(2). Essentially, it requires that to preserve the argument, Zarate-Suarez needed to tell the district court that it would commit legal error by applying that subsection. But as mentioned, Zarate-Suarez did just that by arguing that the district court could not impose the two levels under § 2D1.1(b)(2) without finding that *she herself* had used violence, credibly threatened the use of violence, or directed the use of violence. This suffices to have alerted the district court that Zarate-Suarez objected to her sentence being enhanced based on others'

---

[12] Our court relied on this treatise in *Pena-Sarabia*, 297 F.3d at 989, as authority disagreeing with *Hallum*, as discussed earlier in footnote 9.

13

conduct. Otherwise stated, her § 2D1.1(b)(2) objection necessarily also preserved an objection to the district court's application of § 1B1.3(a)(1)(B).

B. **Why Zarate-Suarez Would Prevail on Plain-Error Standard if it Did Apply.**

Even under plain-error review, Zarate-Suarez should prevail. First, as explained above, the district court erred by not denying the § 2D1.1(b)(2) enhancement according to the plain text of that subsection and § 1B1.3. By requiring that Zarate-Suarez herself have used, credibly threatened, or directed violence, § 2D1.1(b)(2) "otherwise specified" that § 1B1.3(a)(1)(B) does not apply. As stated above, in concluding that the district court erred in enhancing Zarate-Suarez's sentence under § 2D1.1(b)(2), I rely on the instruction from the Sentencing Commission, the reasoning from *Pena-Sarabia* and *Conley*, and the supporting statements in Hutchinson et al., *Federal Sentencing Law and Policy*.[13]

Second, the error is plain. Our court has often ruled that error can be plain based on the text of statutes or Guidelines. *See, e.g.*, *United States v. Faulkner*, 950 F.3d 670, 678 (10th Cir. 2019) (noting in a dispute about a Guidelines application that, in addition to showing that the Supreme Court or Tenth Circuit has addressed an issue, a defendant can show an error is plain "if the district court's interpretation was clearly erroneous" (citation and internal quotation marks omitted)); *United States v. Fagatele*, 944 F.3d 1230, 1239 (10th Cir. 2019) (ruling that to show that error is plain, a defendant must

---

[13] The majority declines to rule on whether the district court erred in applying two offense levels under § 2D1.1(b)(2), instead opting to rule that the error was not plain. Majority Op. at 10 (noting that "even if we continued the plain-error analysis, we would affirm. That's because even if we assume the district court erred in applying the reasonably foreseeable standard, that error was not plain.").

14

"demonstrate either that this court or the Supreme Court has resolved these matters in his favor, or that the language of the relevant statutes is 'clearly and obviously' limited to the interpretation [he] advances" (citations omitted)); *United States v. Brown*, 316 F.3d 1151, 1158 (10th Cir. 2003) (ruling based on the text of U.S.S.G. § 3E1.1 that the district court plainly erred by providing a one-level reduction for acceptance of responsibility when that Guideline allowed a binary choice between two or no levels); *United States v. Alessandroni*, 982 F.2d 419, 420 (10th Cir. 1992) (reviewing for plain error a defendant's claim that the district court had erroneously applied the Guidelines' criminal-history provisions and noting that "the imposition of a sentence based on an erroneous interpretation of the law constitutes plain error" (citation omitted)).

The text of § 2D1.1(b)(2) and § 1B1.3 demonstrates that the district court's error is plain. Their text alone shows two reasons that the district court's error is plain. First, as explained above, "the defendant" as used in § 2D1.1(b)(2) and "[u]nless otherwise specified" as used in § 1B1.3 bar the district court's use of § 1B1.3(a)(1)(B) to hold Zarate-Suarez responsible for the violent acts of others. Second, the Guidelines elsewhere reinforce this. As earlier mentioned, some Guidelines commentary notes—including the one involved in *Pena-Sarabia*—provide that "Consistent with § 1B1.3 (Relevant Conduct)," the term "defendant," as used in the particular Guidelines section "limits the accountability of the defendant to the defendant's own conduct and conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused." U.S.S.G. §§ 2K2.1 cmt. n.13(B), 2K3.1 cmt. n.1(A), 3B1.5 cmt. n.2, 5C1.2 cmt. n.4; *see also* U.S.S.G. § 3C1.2 cmt. n.5 ("Under this section, the defendant is accountable

15

for the defendant's own conduct and for conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused."). Again, the introductory words show the district court's error to be plain: "Consistent with § 1B1.3 (Relevant Conduct)." This limits the meaning of "defendant" for § 1B1.3 (Relevant Conduct) purposes to the defendant's "own conduct and conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused." Thus, for any uses of "defendant" in the Guidelines Manual, this "Consistent with § 1B1.3" limitation includes within "defendant" conduct listed at § 1B1.3(a)(1)(A), but it *excludes* conduct listed at § 1B1.3(a)(1)(B).

In addition, Zarate-Suarez has met the third prong of the plain-error analysis by showing that the error affected her substantial rights—she has shown a reasonable probability that absent the error the outcome of the proceeding would have been different. *United States v. Dominguez Benitez*, 542 U.S. 74, 81–82 (2004). In *Molina-Martinez v. United States*, 136 S. Ct. 1338 (2016), the Court reviewed for plain error a district court's miscalculation of the defendant's advisory Guidelines range. The Court noted that "[w]hen a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Id.* at 1345. Though the district court varied downward by a third of Zarate-Suarez's advisory sentence (from 30 to 20 years), I see nothing in the sentencing transcript revealing what sentence the district court would have imposed absent the two

16

offense levels added under § 2D1.1(b)(2).[14] *See United States v. Sabillon-Umana*, 772 F.3d 1328, 1333 (10th Cir. 2014) ("When the court's starting point is skewed a 'reasonable probability' exists that its final sentence is skewed too." (citation omitted)).

Finally, on a showing of the first three prongs of the plain-error analysis, this court has "discretion to correct the forfeited error if the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Molina-Martinez*, 136 S. Ct. at 1343 (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)) (internal quotation marks omitted). In *Sabillon-Umana*, 772 F.3d at 1334, this court noted that

> whether a court clearly miscalculates the advisory guidelines range or clearly mistakes its entitlement to depart from that range under § 5K1.1, a defendant's substantial rights and the integrity of the judicial process are surely at risk: in either event the benchmark for the entire sentencing process rests on an obviously mistaken premise.

And the court concluded by stating that "we can think of few things that affect an individual's substantial rights or the public's perception of the fairness and integrity of the judicial process more than a reasonable probability an individual will linger longer in prison than the law demands only because of an obvious judicial mistake." *Id.* at 1335.

For these reasons, I would vacate the district court's sentence and remand for resentencing without the two offense levels imposed from § 2D1.1(b)(2).[15]

---

[14] The district court stated that it was holding against Zarate-Suarez the beating up of the girlfriend, and then it imposed the 240-month sentence. I am uncertain whether the sentence would remain 240 months if the district court no longer held the violence against her as it did by applying two offense levels under § 2D1.1(b)(2).

[15] I acknowledge that publishing a dissent is unusual when the majority does not publish its opinion. I publish this one because of the importance of relevant conduct in federal sentencings and the need for rulings explaining how it works. Unwarranted Guidelines enhancements lead to unwarranted prison time.